# DECISIONS

## OF THE

## SUPREME JUDICIAL COURT

### OF

## MASSACHUSETTS

---

### Commonwealth *vs.* Salvatore Avalos.

Suffolk. February 2, 2009. - May 28, 2009.

Present: Marshall, C.J., Ireland, Spina, Cowin, Cordy, Botsford, & Gants, JJ.

*Evidence,* Cross-examination, Bias of government witness, Prior violent conduct, Impeachment of credibility, Prior misconduct. *Practice, Criminal,* Judicial discretion. *Constitutional Law,* Fair trial. *Witness,* Bias, Impeachment, Credibility.

There was no merit to a criminal defendant's argument that a trial court judge's rulings limiting cross-examination of Commonwealth witnesses impermissibly restricted the defendant's ability to present his defense or to cross-examine the witnesses as to their bias and motive to lie, where the rulings properly excluded evidence that was speculative, cumulative, marginally relevant, or of little legitimate value. [6-11]

Indictments found and returned in the Superior Court Department on September 28, 2004.

The cases were tried before *Elizabeth M. Fahey*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Theodore F. Riordan* (*Deborah Bates Riordan* with him) for the defendant.

*Macy Lee*, Assistant District Attorney (*Leora Joseph*, Assistant District Attorney, with her) for the Commonwealth.

CORDY, J. After a jury trial, the defendant, Salvatore Avalos, was convicted on three indictments charging rape of a child in violation of G. L. c. 265, § 23, and three counts of indecent assault and battery on a child under fourteen, in violation of G. L. c. 265, § 13B. On appeal, Avalos claims that the trial judge erroneously restricted defense counsel's cross-examinations of Commonwealth witnesses, preventing Avalos from exposing their bias, prejudice, and motives to lie. We transferred the case from the Appeals Court on our own motion. We affirm the convictions.

1. *Background.* The victim in this case is Natasha,[1] the step-granddaughter of Avalos. The criminal investigation preceding the defendant's indictment originated after Natasha's mother, Diane, discovered and read a "diary"[2] belonging to Natasha. Natasha received the diary, and wrote in it, when she was in the eighth grade. Diane found the diary in 2004, when Natasha was in the ninth grade, while unpacking from a move they made.

In the diary, Natasha answered several questions posed by the book; after one question, "Have you ever been sexually abused?" she wrote, "Yes." On other pages, Natasha had written "unflattering" descriptions of Diane.[3] Natasha also wrote that she would "flirt" with boys; that she wanted a boy friend; that she "cuddled" with a boy; that she "need[ed] to forgive [her]self for keeping so many secrets, and lying"; that she had forged her mother's name, causing Diane to beat her; and that she could tell her grandmother "everything."

After discovering the diary, Diane confronted Natasha, angered primarily by what Natasha had written about her rather than by

---

[1] A pseudonym, pursuant to G. L. c. 265, § 24C.

[2] The exterior of the "diary" looks like a book, but it contains questions and spaces to write answers.

[3] "My mother is mean, rude, and crude, she doesn't love me at all I hate her a lot she doesn't care I wish I was as free as a bird [*sic*]." Natasha also described her mother as "hateful" and "annoying."

what she had written about being sexually abused. Natasha appeared nervous and upset, and later became ill. The two went to the Chelsea police station where Natasha filed a report of sexual abuse.

Before trial, the Commonwealth filed a motion in limine to exclude the contents of the diary. At the hearing on the motion, defense counsel stated that he intended to use the diary in his defense of the case. In particular, he intended to ask Natasha whether she had ever "characterized herself or thought of herself as a flirt," and, if she answered, "No," to introduce a portion of the diary in which she described herself as "flirtatious." He also stated that he intended to introduce statements in the diary showing Natasha's "wanting to have a boyfriend" in support of his theory that some of the abuse that she blamed on Avalos had actually occurred, consensually, with a boy friend. He further intended to introduce the portion of the diary describing Diane as, in his words, "a big pain in the ass." Finally, he argued that Natasha's writings in the diary were "directly relevant to her credibility and her lifestyle," especially the writings describing herself as a flirt, as a liar, and as someone who wished she had a boy friend.

The judge ruled that in opening statements, the attorneys could mention only the question and answer from the diary regarding sexual abuse. She reasoned that "whether [Natasha] thinks of herself as a flirt or as a liar or what she wants with respect to her boyfriend and her position with respect to her mother that it's in the diary is not germane to any issue before the jury."[4] The judge reserved ruling on the Commonwealth's motion in limine beyond the opening statements, asking each attorney to "approach the sidebar before he seeks to offer any of that during trial."

The Commonwealth's first witness was Natasha, who was sixteen at the time of trial. She testified that Avalos sexually molested

---

[4]The Commonwealth argues that the judge excluded statements from the diary "to avoid violations of the rape shield laws." See G. L. c. 233, § 21B ("Evidence of the reputation of a victim's sexual conduct" and "[e]vidence of specific instances of a victim's sexual conduct . . . shall not be admissible" in trials for sexual assaults). That is incorrect. Although the rape shield statute was mentioned fleetingly by the prosecutor during the hearing on the motion in limine, the judge did not reference it, or base any of her pretrial or midtrial rulings on it.

her over the course of several years, beginning when she was six or seven years old, and ending when she was about twelve. She testified that on different dates, Avalos indecently touched her, and made her engage in specific sexual acts with him. Natasha also testified that her first oral report of the abuse occurred in a conversation with a classmate, when Natasha was in the ninth grade.[5] The report occurred at the high school she was attending before Natasha and Diane moved, and before Diane discovered the diary.

On cross-examination, defense counsel spent much of his time highlighting inconsistencies in Natasha's account. He asked how she could remember so many details from events that occurred years earlier, why she did not "call out" for her grandmother when Avalos touched her at his house, and why she chose, in the ninth grade, to tell the classmate about incidents that occurred much earlier. He also elicited testimony from Natasha that her mother was angry with her after reading the diary, and that at the time Natasha was writing in the diary, she did not consider herself to be a completely truthful person.[6]

Defense counsel also asked if the diary contained a question about people Natasha felt she could "tell anything at all to." The judge sustained an objection by the Commonwealth, ruling that defense counsel could ask about the content of the diary only if Natasha testified in a manner that was inconsistent with those writings. Defense counsel proceeded accordingly, and Natasha testified that she felt she could tell her grandmother "anything," but had not told her grandmother about the sexual abuse. The judge later sustained objections when defense counsel asked whether Natasha had trouble with lying during that period; whether she had ever forged her mother's signature; and whether her mother had ever struck her.

The Commonwealth then called Diane to the stand. She explained that she met Avalos when she was about thirteen, and

---

[5] As the "first complaint" witness, that classmate testified that Natasha told her that her grandfather had touched her. See *Commonwealth* v. *King*, 445 Mass. 217, 218-219 (2005).

[6] Defense counsel also elicited testimony that Natasha had written "yes" in her diary in response to the question asking whether she had ever been sexually abused.

that Avalos later married her mother, Lucilla. She also testified that Avalos was alone with Natasha on several occasions over many years. Finally, she described finding Natasha's diary, reading it, becoming upset and angry, and taking Natasha to the police station.

On cross-examination, defense counsel asked Diane about a period around 2001 when Avalos moved to Florida for a few months, and Lucilla later joined him. He asked whether Avalos moved without Lucilla because "[t]hey weren't getting along." Diane testified that to her knowledge, that was not the reason, and that she was "under the impression that he was going to buy a house and they were going to move in there." On further questioning about the marriage between Lucilla and Avalos during that period, Diane testified that it was doing both fine and not fine "[o]n occasion." She also denied that Avalos chose to move to Florida because Diane prevented his daughter from a prior marriage from visiting him.

The judge sustained objections to a series of questions posed to Diane about statements written by Natasha in her diary: whether Natasha had described herself as a liar; whether Natasha had described Diane as "rude and crude"; and what Diane read that caused her to be angry.

On the third day of trial, Avalos took the stand. He denied touching Natasha inappropriately in any way. He also testified that at one time, a boy friend of Diane lived with Diane and Natasha. Avalos then testified that he eventually moved to Florida to "put an end to" problems he was having with Diane. The problems arose, he said, when Diane attempted to prevent his daughter from staying with him for a week.

Defense counsel asked if Avalos was also having marital difficulties with Lucilla at the time, and the Commonwealth objected on relevance grounds. At sidebar, defense counsel argued that he wished to show that Lucilla believed Avalos was seeing another woman, that Lucilla may have told Natasha the same, and that Natasha may have then become biased against Avalos. The judge sustained the objection, saying, "You need something that's a little bit more concrete and not totally speculative." Defense counsel did not pursue this line of inquiry further, but later elicited testimony from Avalos that Diane had told him (in 2001) that, "I was going to be sorry I left her mother in the future."

In closing, defense counsel argued that Natasha and Diane were not credible witnesses, noting that they cried during direct testimony but not during cross-examination. He attacked details of Natasha's testimony; for example, he argued that it would make little sense for Avalos to commit a sexual assault while his wife (Lucilla) was somewhere in the house. He also gave his broader theory of the case, arguing that when Diane angrily confronted Natasha about the contents of the diary, Natasha blamed Avalos for a sexual assault to appease Diane.

The jury returned a verdict of guilty on all the indictments.

2. *Discussion.* Avalos argues that the judge impermissibly restricted his ability to cross-examine Commonwealth witnesses to demonstrate bias, prejudice, and a motive to lie. He contends that at several junctures, the judge prevented him from exploring Avalos's marital problems with Diane's mother, Lucilla; Natasha's and Diane's knowledge of these marital problems; Natasha's relationship with Diane; the details of the confrontation between Diane and Natasha about the diary; Diane's relationships with men; Natasha's truthfulness; and Natasha's "dreams . . . of having a relationship."

If he had been allowed to explore those avenues, Avalos argues, he would have been able to prove his theory of the case: that when Diane angrily confronted Natasha about the diary, Natasha blamed Avalos for a sexual assault to diffuse Diane's anger. Blaming Avalos would have effectively shifted Diane's attention, he contends, because Diane was angry at Avalos for causing problems in his marriage to Lucilla (Diane's mother).[7] Avalos also argues that he could have undermined Natasha's credibility by introducing portions of the diary where Natasha called herself a "liar," and might even have shown that the entire assault was the figment of Natasha's imagination, rooted in a desire to have a boy friend.

"Cross-examination of a prosecution witness to show the witness's bias or prejudice is a matter of right under the Sixth Amendment to the Constitution of the United States and art. 12 of the Declaration of Rights of the Commonwealth." *Common-*

---

[7]Avalos does not address whether the testimony of the first complaint witness, which established that Natasha reported abuse by Avalos before the confrontation with her mother, undermines that theory.

*wealth* v. *Allison*, 434 Mass. 670, 681 (2001). "If 'on the facts, there is a possibility of bias, even a remote one, the judge has no discretion to bar *all* inquiry into the subject' " (emphasis added). *Id.*, quoting *Commonwealth* v. *Tam Bui*, 419 Mass. 392, 400, cert. denied, 516 U.S. 961 (1995).

Nonetheless, "[d]etermining whether the evidence demonstrates bias . . . falls within the discretion of the trial judge." *Commonwealth* v. *LaVelle*, 414 Mass. 146, 153 (1993). We also have held that "[a] judge does have discretion to limit cross-examination concerning possible bias when further questioning would be redundant," *Commonwealth* v. *Allison, supra,* quoting *Commonwealth* v. *Tam Bui, supra* at 400; where there has been such "extensive inquiry" that the bias issue "has been sufficiently aired," *Commonwealth* v. *LaVelle, supra* at 154, quoting *Commonwealth* v. *Hicks*, 377 Mass. 1, 8 (1979); where questioning involves a "collateral matter," *Commonwealth* v. *Sperrazza*, 379 Mass. 166, 169 (1979); where the offered evidence is "too speculative," *Commonwealth* v. *Tam Bui, supra* at 402; or where the evidence is being offered only to show the bad character of the witness, *Commonwealth* v. *Weichel*, 403 Mass. 103, 106 (1988). "The burden of showing an abuse of that discretion, an abuse that must be shown on the trial record, rests on the party claiming it, in this case [Avalos]." *Id.* at 105, citing *Commonwealth* v. *Underwood*, 358 Mass. 506, 513 (1970).

For the reasons that follow, we conclude that the judge did not impermissibly restrict Avalos's ability to cross-examine witnesses and present his defense.

a. *Evidence of relationships between Natasha, Diane, Avalos, and Lucilla.* First, Avalos argues that he was improperly prevented from demonstrating that Avalos and Lucilla experienced marital difficulties before Diane confronted Natasha about the diary. He complains specifically only about a question he was not permitted to answer during his own direct examination, that is, whether he was having any marital difficulties with Lucilla. As noted earlier, when the Commonwealth objected on relevance grounds, defense counsel responded with an explanation the judge found "totally speculative." This ruling was not error. *Commonwealth* v. *Tam Bui, supra* at 400-401 (bias theory too tenuous to be one he was entitled to pursue on record presented). Moreover,

a review of Avalos's testimony in its entirety demonstrates that the presence of marital difficulties between Avalos and Lucilla was sufficiently presented to the jury.[8]

Second, Avalos argues that he was prevented from cross-examining Natasha and Diane to establish that they knew about the marital problems between Avalos and Lucilla. There was no abuse of discretion because the issue was "sufficiently aired." *Commonwealth* v. *LaVelle, supra.* Defense counsel was permitted to ask Natasha four questions on this subject; she denied any knowledge of the reasons for the separation between Avalos and Lucilla. The judge sustained only two objections, preventing defense counsel from asking, "[S]he [Lucilla] was pretty mad at your grandfather for leaving her, wasn't she?" and "Did she ever discuss with you any feelings that she had about the fact that your grandfather had left her?" Natasha had already denied knowledge of their marital problems in nearly identical questions; further questioning on the subject was therefore unnecessary.

Similarly, defense counsel was permitted to ask Diane several times about the marital problems between Avalos and Lucilla. Diane testified that she did not believe Avalos moved to Florida in response to marital problems, and that their marriage was doing fine and not fine "[o]n occasion." The judge sustained objections to only two questions: "Well how many more occasions was it doing fine or not fine?" and "What percentage of the time was the marriage okay, and what percentage wasn't it?" There was no abuse of discretion in curtailing the questioning on that point.

Third, Avalos argues that he was prevented from probing the relationship between Natasha and Diane. The trial record reflects otherwise. Defense counsel was able to explore the relationship sufficiently. As Avalos concedes, Natasha testified that her relationship with Diane "wasn't perfect." She also agreed that she sometimes "thought [Diane] was rude and crude and negative," and conceded that sometimes she "wanted to be free as a bird, and not have [Diane] around [her]." Defense counsel was also permitted to ask Diane whether, in the diary, Natasha called Diane "rude," "[c]rude," and "[h]ateful."

The judge properly prevented defense counsel from asking

---

[8]For example, Avalos testified that Lucilla was his "ex-wife," and that he went to Florida "to try to save [his] marriage."

Natasha whether she had ever been physically abused by her mother; as the Commonwealth argued, that line of inquiry would create "its own trial as to whether the girl had been physically abused by the mother," and could "bring[] out the bad character of the mother." The judge did not abuse her discretion in "exclud-[ing] marginally relevant . . . evidence [to] prevent the undue exploration of collateral issues." *Commonwealth* v. *Adjutant*, 443 Mass. 649, 663 (2005).

Finally, Avalos argues that the judge erred in preventing defense counsel from establishing that boy friends of Diane might have had the opportunity to commit the crimes. He is incorrect. At the hearing on the motion in limine, the judge never excluded evidence of Diane's boy friends. During trial, the judge repeatedly allowed testimony that a boy friend of Diane lived with her and Natasha. Objections were sustained only when Avalos testified that Diane and Natasha later lived "[w]ith another boyfriend," and when defense counsel asked, "Was that the same person who had been living with [Diane] previously or a different person?" This was not an abuse of discretion.

b. *Evidence of confrontation over diary.* Next, Avalos argues that he was prevented from "establish[ing] the complete context of the diary confrontation." He suggests that he should have been permitted to probe "Diane's state of mind . . . regarding precisely what she had read in the diary."

We disagree. Defense counsel was permitted to elicit testimony from Natasha that Diane was upset at the time of the confrontation; that she was not "act[ing] like herself"; that she looked "sad and stressed out"; and that she did not greet Natasha as she normally would. Natasha agreed with defense counsel's suggestion that she was "not [in] a very good position with [Diane]," because Diane had read all the things in her diary. He also asked if Natasha was afraid Diane would hit her; she answered, "No." Natasha vomited, she testified, because she was nervous and scared. Additionally, defense counsel was permitted to establish that Diane was initially more concerned with the diary descriptions of her than the sexual abuse allegation.

In sum, Avalos had ample opportunity to cross-examine Natasha and Diane for the purpose of laying the groundwork for his argument that Diane was angry, and that Natasha named Avalos to diffuse that anger. See *Commonwealth* v. *LaVelle*, 414

Mass. 146, 153 (1993). Defense counsel was prevented from asking only whether Diane ever struck Natasha and which other diary writings had angered Diane. Each of these questions would have created a trial-within-a-trial on collateral issues. Excluding those lines of inquiry was not an abuse of the judge's discretion. See *Commonwealth* v. *Sperrazza*, 379 Mass. 166, 169 (1979).

c. *Evidence impeaching Natasha's credibility.* Avalos also argues that the judge should have allowed defense counsel to show that Natasha "was an admitted 'liar,' " that she had forged Diane's signature, and that she lied in telling Diane that the diary descriptions of Diane (as crude, rude, and hateful) were not true. The judge's decision to foreclose these questions, Avalos argues, prevented him from impeaching Natasha's credibility.

Avalos proposed a general attack on Natasha's credibility, which he would have supported with her diary statement that she "need[ed] to forgive herself . . . [for] lying." The judge properly excluded this evidence.[9] The mere fact that Natasha admitted in her diary that at some time in her life she lied is hardly probative of her veracity on the witness stand. "[B]ecause the proffered evidence had little, if any, legitimate value, and invited misuse by the jury, the judge clearly did not abuse [her] discretion in excluding it." *Commonwealth* v. *Weichel*, 403 Mass. 103, 106 (1988). Further, the judge allowed Avalos an entirely sufficient cross-examination on whether Natasha lied when she told Diane that the diary descriptions of Diane were not true. After Natasha testified that the statements in the diary were not true, defense counsel asked, "[W]ell if it wasn't true, you'd be lying about it wouldn't you?" Natasha answered, "No," and later explained, "Because by then I felt like that, but I don't anymore." The only question that the judge prohibited was a potentially unfair, compound one: "[D]id you lie in your journal when you wrote these things or did you lie to your mother when you said they weren't true?"

The judge also properly excluded the question about forgery, which also arose from an admission in the diary. Unless there is a criminal conviction, G. L. c. 233, § 21, evidence of "particular bad acts of untruthfulness" is inadmissible for impeachment

---

[9]Defense counsel was permitted to ask whether Natasha considered herself to be a truthful person at the time she wrote the diary.

purposes. *Commonwealth* v. *Olsen*, 452 Mass. 284, 293 (2008), citing *F.W. Stock & Sons* v. *Dellapenna*, 217 Mass. 503, 506-507 (1914).

d. *Evidence that Natasha had dreams of having a boy friend.* Avalos argues that he should have been allowed to pursue a defense that the assault was a figment of Natasha's imagination, prodded by her "dreams (set forth in her diary) of having a relationship and by her exposure to her mother's open sexual relationships." There is no merit to this argument. The judge excluded this evidence only for the purposes of the opening statements, but said that she would revisit the issue at trial if the parties wished. Defense counsel, however, never returned to the issue by seeking to question Natasha or Diane on the subject.

3. *Conclusion.* Avalos was granted adequate license to cross-examine Commonwealth witnesses as to their bias and to present evidence supporting his defense. The judge's rulings were well within her discretion and did not infringe on Avalos's rights under the Sixth Amendment and art. 12. We affirm the convictions.

*So ordered.*