NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11127

COMMONWEALTH  vs.  JOONEL GARCIA.


Essex.      December 6, 2013. - October 29, 2014.

Present:  Spina, Cordy, Botsford, Duffly, & Lenk, JJ.


Homicide.  Home Invasion.  Burglary.  Armed Assault with Intent
    to Rob.  Felony-Murder Rule.  Joint Enterprise.  Evidence,
    Joint venturer, Impeachment of credibility, Cross-
    examination, Redirect examination, Accident.
    Constitutional Law, Assistance of counsel.  Practice,
    Criminal, Required finding, Instructions to jury,
    Assistance of counsel, Capital case.  Witness, Impeachment,
    Cross-examination, Redirect examination.


    Indictments found and returned in the Superior Court
Department on March 1, 2006.

    The cases were tried before David A. Lowy, J.


    Jeffrey L. Baler for the defendant.
    Kenneth E. Steinfield, Assistant District Attorney, for the
Commonwealth.


    DUFFLY, J.  The defendant was indicted on charges of murder

in the first degree and five related offenses in connection with

the death of Rafael Castro on August 26, 2004.[1]  A Superior Court

_____

    [1] The other indictments charged home invasion, G. L. c. 265,

jury found the defendant guilty of murder in the first degree on theories of extreme atrocity or cruelty and felony-murder, based on the underlying felonies of both home invasion and armed or assaultive burglary. The jury also found the defendant guilty of the other charges. The jury did not specify whether they found the defendant guilty of any of the offenses as a principal or as a joint venturer.

On appeal, the defendant maintains that the evidence was insufficient to show that he shared the requisite intent to commit the crimes charged. The defendant contends also that his right to a fair trial was denied when he was not permitted to impeach a Commonwealth witness by confronting her with a child she observed outside the court room, whom she testified she believed to be her deceased child, although the witness was permitted on redirect examination to testify to the reasons she had formed that belief. In addition, the defendant asserts that a new trial is required because the judge erroneously declined to give two requested jury instructions, and because his counsel was ineffective for failing to object when the judge instructed that accident was not a defense to the killing. The defendant

---

§ 18C, armed or assaultive burglary, G. L. c. 266, § 14, armed assault with intent to rob, G. L. c. 265, § 18 (b), and two counts of kidnapping, G. L. c. 265, § 26, one with respect to Rafael Castro and one with respect to Norma Cedeno.

also requests that we exercise our authority to provide relief pursuant to G. L. c. 278, § 33E.  We affirm the convictions, and discern no reason to grant a new trial or to reduce the verdict of murder in the first degree to a lesser degree of guilt.

Background.  We summarize the facts the jury could have found, reserving certain facts for later discussion.

1.  The shooting on August 26, 2004.  Castro, whose street name was "Calvo," was a drug dealer.  In August, 2004, Castro lived with Ramona Gonzalez in a sixth-floor apartment in an apartment building in Lawrence.  At times, Gonzalez also was involved in drug dealing, as was her daughter, Norma Cedeno, who lived primarily in the Dominican Republic.  On August 26, 2004, Gonzalez was in New York.  Castro drove to Logan airport in Boston to pick up Cedeno, who was to arrive that evening from the Dominican Republic.  After picking up Cedeno, Castro drove her back to the apartment building, where they arrived at approximately 11:15 P.M.  Castro used his key to unlock the front door to the apartment.  Cedeno entered the darkened apartment first, putting down some takeout food they had purchased en route, and heading directly to the bathroom.  Although the apartment lights were off, there was some illumination from exterior street lighting.  As Cedeno took a step into the bathroom, a man grabbed her and threw her to the

floor, holding her down while putting a gun to the back of her neck and ordering her to look down. Cedeno cried out, "Oh my God."

Earlier that day, the defendant and his girl friend, Jessica Encarnacion, had been in their apartment when a man known as "Gringo"[2] arrived with two other men, Cesar Santana and Alfredo Catalino. Another man, "Propeto," had arrived at the defendant's apartment separately several hours earlier in the day, and was there when Gringo and the other two men arrived.[3] The four men often socialized together. Gringo, who was acquainted with Castro, told the defendant that there was "a job to do," and that they were going to "take something from Calvo . . . some drugs that he had" that had been brought from Texas. If the defendant agreed to help, they would be able to live as "retirees." Around 2 P.M., Gringo drove the defendant to Castro's apartment building and pointed it out to him. Later that night, Gringo drove the defendant, Santana, and Catalino to the apartment building.[4] Gringo said that he had learned that

---

[2] The defendant rented the apartment from "Gringo," who was also known by several other names, including Ramon Ortiz, Ramon Ortiz Peralta, Josue (or Joshua or Joseph) Martinez Vargas, and Santo Delarosa.

[3] Although the spelling "Propito" also appears in the record, we refer to "Propeto" for convenience.

[4] Propeto did not go with the others to Castro's apartment,

Castro was not there, and they would wait for Castro to return.

The four men, two of whom had guns, entered the building using a pass card Gringo had and then entered Castro's apartment using a key that Gringo produced. They waited in the apartment for approximately thirty minutes before they heard a door opening. At that point, Gringo told the defendant, Santana, and Catalino to go into the bathroom and that he, Gringo, would remain in the living room. Castro entered the apartment after Cedeno, and started to run toward the living room when another man "jumped" out to meet him. Castro lunged at the man, and the man shot Castro in the forehead, seriously injuring him. The bullet, which did not penetrate Castro's face, traveled diagonally downward from the top of his forehead, where the wound was deepest, over his right eye and cheek, lacerating the skin. He was alive, but bleeding profusely. Some of the men, including the defendant, took Castro into the smaller of the apartment's two bedrooms. The men, whose voices she did not recognize, told Cedeno that they would kill her if she looked up because she "was going to know who they were," and put a pillow case over her head, which remained covered until the men left the apartment. Cedeno was taken to the larger bedroom where one

but was watching television with the defendant's girl friend, Jessica Encarnacion, when the four men returned at approximately 1 A.M.

of the men remained with her.

Some of the men wrapped duct tape around Castro's ankles and wrists,[5] and one or more yelled at Castro, demanding drugs and money.  When Castro denied that he had any drugs, the men demanded that he make a telephone call.  Castro offered to get them $20,000 if they cut him loose, but the men laughed at this offer and refused.  They continued to yell at Castro, and to hit him.  Cedeno could hear Castro whimpering and groaning in pain, asking them to remove the tape, and repeatedly asking for water.  At one point, Cedeno was brought into the room with Castro; the men took off her shirt and threatened to burn her with a hot iron.  Cedeno "could smell the burn of the iron," and she implored Castro to tell the men what they wanted to know.  In a weak voice, Castro said, "Don't do it."  One of the men put Cedeno's shirt back on and took her back to the other bedroom.  Cedeno could hear the men walking around the apartment making calls on their cellular telephones, becoming angrier, and saying things like, "He doesn't want to talk," and, "He doesn't want to make the phone call.  What are we going to do next?"  One of the men said they should "[j]ust kill him."

A man tied Cedeno's ankles with duct tape, but she

---

[5] According to expert testimony, the defendant's right thumb print matched a latent print on a role of duct tape police found in the apartment.

persuaded him not to tie her hands.  The man told Cedeno that three of them were leaving, but that one was going to stay behind in case she tried to call the police.  In an angry voice, he told her, "We already know who you are, so if you call the police, or . . . one of us get[s] caught, we [are] just going to come back and get you."  He said that he had a blade in his hand and would cut her face, and that they "all [had] guns." Approximately ninety minutes had passed since the incident began.  When the man left, Cedeno heard the door shut, but was not sure whether any of the other men remained in the apartment. She waited before calling out to Castro and asking if he was there alone; in a faint voice, he asked her to open the door and help him.  Cedeno pulled herself into the kitchen and cut the duct tape from her ankles with a knife.

The door to the bedroom in which Castro had been placed was locked, and Cedeno used part of a bracelet to pick the lock. Castro was lying on the floor and there was a lot of blood, particularly on his face.  She removed the duct tape binding him, and held his hand for a short time to comfort him.  She tried calling for help on the apartment's telephone, but it had been pulled from the wall, and the intruders had taken Castro's cellular telephone.  Cedeno found another telephone and telephone cord in a drawer, and used it first to call her mother

and Ricardo Rosa, a former boy friend who lived in the same building and was a friend of Castro's. She was afraid to contact police at that point because she did not know if the men were waiting to see if she would do so. After speaking with her mother and Rosa, Cedeno telephoned 911; an ambulance, dispatched at 12:53 A.M., arrived three to four minutes later. Upon arriving, paramedics saw an "extremely large pool of blood" and found Castro lying on the bedroom floor. They determined that Castro was dead and notified Lawrence police at 1:03 A.M. The cause of death was cardiac arrest resulting from loss of blood from the gunshot wound to the forehead.

2. Flight from Massachusetts. Encarnacion and Propeto were watching television when the defendant returned to his apartment at approximately 1 A.M, accompanied by Gringo, Santana, and Catalino. The defendant was not wearing the clothes he had been wearing when he left, but, rather, was wearing "girl's pants" and a different shirt. When he took off that shirt, Encarnacion could see the front of the shirt that the defendant had been wearing earlier, covered with blood spatter. Encarnacion also observed blood spatter on the defendant's shoes. When she asked about the blood and the pants, the defendant said that nothing had happened and not to worry about it. He told her: "Just, [s]hut up. Get me a bag.

I need to take these clothes off and put them in a bag.  And just keep packing.  We have to leave here to [go] out of state."

Encarnacion gave the defendant a trash bag; he put the clothes he had been wearing into the bag, and left the apartment with it.  Gringo, Santana, and Catalino went with him.  They returned five minutes later, without the bag.[6]  The defendant was acting nervous.  In response to Encarnacion's questions, he told her that he had discarded the bag; when she asked why, he said, "I'll talk to you when we get out of here."  He then said that they would have to go to the Dominican Republic because his visa was expiring.  Less than fifteen minutes later, they left in Gringo's automobile, headed for John F. Kennedy Airport in New York.

During the drive, the defendant took a gun from a bag; it was gray with a laser light.  Encarnacion had never seen the gun before.  The defendant said, "Damn, I bought a gun and now I have to throw it away," then, later, "[s]uch a good gun, and I have to throw it away."  The men discussed how to get rid of the gun.  After approximately half an hour, they took an exit off of the highway and stopped; the defendant and Gringo took the bag that held the gun and disappeared into the woods.  They were

---

[6] Propeto left with the other men, but did not return with them.

gone seven minutes while the others waited in the vehicle. When the two men returned, the defendant said that they would go to New York "as soon as possible" and take "the first plane to [the] Dominican Republic." No one responded when Encarnacion asked what had happened.

At the airport, Gringo gave the defendant $1,000 in cash, which Encarnacion used to purchase two one-way tickets on a flight leaving for the Dominican Republic at 7 A.M. During the flight, the defendant told Encarnacion that something really bad had happened, but that he was not going to talk until he had a chance to calm down and get some rest. Once they had landed and had reached the defendant's brother's house, the defendant told Encarnacion that he had gone to claim some money that someone owed him for drugs, and that he, Gringo, Santana, and Catalino waited in the man's apartment until the man arrived. The defendant said that he was with Gringo in the bathroom, and Gringo had the gun because he planned to scare the man into giving him the money that the man owed. When the man opened the bathroom door and turned on the light, he was shocked to see Gringo with a gun. The man was trying to take the gun from Gringo when the gun went off accidentally and shot the man. The defendant said that they had not expected the man's daughter, who had walked into the apartment with the man, to be there.

The defendant and Catalino tied the man up using duct tape and told the man that they would make a call for the money, but they did not get anything and left.

Encarnacion eventually returned to Lawrence and spoke with police several times concerning the events of August 26. The defendant was arrested after he, too, returned to Lawrence. While at the Suffolk County house of correction, the defendant gave an audiorecorded statement to police, in which he admitted to going to Castro's apartment with the other three men on August 26, intending to rob Castro, but stated that Gringo had been the one holding the gun, which the defendant said discharged accidentally when Castro lunged at Gringo.

Discussion. 1. Sufficiency of the evidence. The defendant claims that the evidence was insufficient to establish that he shared the intent required to support his convictions of murder, home invasion, armed or assaultive burglary, and armed assault with intent to rob.[7] In reviewing a claim of insufficient evidence, we ask whether, viewing the evidence in the light most favorable to the Commonwealth, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Commonwealth v. Perez, 460

---

[7] The defendant conceded at trial that the evidence was sufficient to support a finding of guilt as to both charges of kidnapping.

Mass. 683, 702 (2011), quoting Commonwealth v. Latimore, 378 Mass. 671, 677 (1979).  We take this view of the evidence notwithstanding any evidence to the contrary presented by the defendant.  Commonwealth v. Latimore, supra at 676-677.

In reviewing the sufficiency of the evidence on a theory of joint venture, we consider whether the evidence supports a finding that "the defendant knowingly participated in the commission of the crime charged, alone or with others, with the intent required for that offense."  Commonwealth v. Norris, 462 Mass. 131, 138-139 (2012), quoting Commonwealth v. Zanetti, 454 Mass. 449, 468 (2009).  "The felony-murder rule 'imposes criminal liability for homicide on all participants in a certain common criminal enterprise if a death occurred in the course of that enterprise.'"  Commonwealth v. Hanright, 466 Mass. 303, 307, (2013), quoting Commonwealth v. Matchett, 386 Mass. 492, 502 (1982).  To be liable for felony-murder, a defendant need only possess the intent necessary for the underlying felony.  Commonwealth v. Hanright, supra.  Because the underlying felonies here of home invasion, G. L. c. 265, § 18C, and armed burglary, G. L. c. 266, § 14, as well as the separate offense of armed assault with intent to rob, G. L. c. 265, § 18 (b), require that the Commonwealth establish that the perpetrator was armed, "knowledge of a weapon is an element of the Commonwealth's proof

when a defendant is prosecuted on a theory of joint venture." Commonwealth v. Britt, 465 Mass. 87, 99 (2013). See Commonwealth v. Gorman, 84 Mass. App. Ct. 482, 489 (2013).

The evidence presented would have allowed the jury to find that the defendant intended to aid in robbing Castro and that he knew that at least one of the intruders was armed. The jury heard evidence that the defendant agreed to go with Gringo to take a large quantity of drugs from Castro; that the defendant went to Castro's apartment with Gringo to become familiar with it and then returned at a time when they had information that Castro would not be present; that at least two of the men were armed when they entered the apartment; that upon hearing Castro unlocking the door, some of the men secreted themselves in the bathroom; that one of the men wanted to use a gun to scare Castro into giving them money, and shot Castro soon after Castro entered the apartment; and that one of the guns wielded belonged to the defendant who was in possession of it shortly after the men left the apartment. This evidence sufficed to show that the defendant had the requisite intent to commit home invasion, armed burglary, and armed assault with intent to rob.

The defendant's actions after the men left Castro's apartment provided additional evidence of an intent to participate in a joint venture to commit the crimes charged. The

four men returned together to the defendant's apartment, where they discarded his bloodied clothing, and planned and executed a further escape. See Commonwealth v. Akara, 465 Mass. 245, 255 (2013), and cases cited (defendant seen holding gun and standing near coventurer immediately before shooting, and fleeing while laughing with coventurers immediately after shooting); Commonwealth v. Williams, 422 Mass. 111, 121 (1996) ("Joint venture may be proved by circumstantial evidence, including evidence of flight together"). Hence, viewing the evidence in the light most favorable to the Commonwealth, the jury heard sufficient evidence to conclude beyond a reasonable doubt that the defendant was guilty of armed home invasion and armed burglary and, consequently, of felony-murder, as well as of assault with intent to rob. See Commonwealth v. Pytou Heang, 458 Mass. 827, 836 (2011).

There was also sufficient evidence from which the jury could have concluded that the defendant possessed the requisite intent to commit murder in the first degree on a theory of extreme atrocity or cruelty. The mental intent necessary to support such a conviction is malice. Commonwealth v. Szlachta, 463 Mass. 37, 47 (2012), quoting Commonwealth v. Cunneen, 389 Mass. 216, 227 (1983). "Malice is defined in these circumstances as an intent to cause death, to cause grievous bodily harm, or to do an act

which, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would follow."  Commonwealth v. Szlachta, supra at 45-46, quoting Commonwealth v. Chhim, 447 Mass. 370, 377 (2006).

Here, the Commonwealth introduced evidence that, while Castro was bleeding profusely following the shooting, the defendant and the other intruders bound and repeatedly struck him as he moaned in pain and asked for water.  See Commonwealth v. Semedo, 422 Mass. 716, 720 (1996), citing Commonwealth v. Mahoney, 406 Mass. 843, 848 (1990) (sufficient evidence of malice based on plain and strong likelihood of death, where reasonable person would have known that victim could suffer death as beating progressed); Commonwealth v. Plunkett, 422 Mass. 634, 637 (1996) (evidence would have sufficed to show malice based on plain and strong likelihood of death where defendant bound and gagged victim, resulting in victim's death).  Castro's voice became weak during the time the intruders were in the apartment, while they were musing aloud on whether they should kill him; the defendant himself described Castro as barely alive by the time he and the other men left.  Furthermore, before departing, the intruders locked the door to the bedroom where Castro was restrained at both his hands and his feet, pulled the apartment telephone cord from the wall, took Castro's cellular telephone, warned Cedeno

not to call for help, and left her in another room with her ankles bound. The jury could have found that a reasonable person would have known that all of these actions impeded Castro's ability, while bleeding heavily, to obtain emergency assistance, and that there was a plain and strong likelihood that death would follow. See Commonwealth v. Auclair, 444 Mass. 348, 363-364 (2005); Commonwealth v. Maynard, 436 Mass. 558, 562-563 & n.4 (2002); Commonwealth v. Perry, 432 Mass. 214, 218, 221-224 (2000).

2. Impeachment of Commonwealth's witness. In addition to challenging the sufficiency of the evidence, the defendant contends that he was denied his right to a fair trial because he was not permitted to impeach Encarnacion by confronting her with a child whom she had observed outside the court room and believed to be her deceased daughter. On direct examination, Encarnacion testified that she became pregnant with the defendant's child while they were in the Dominican Republic, after their arrival on August 27, 2004. She returned to the United States in February or March of 2005, and ended her relationship with the defendant that June. Encarnacion gave birth to her daughter on August 22, 2005.[8]

---

[8] Encarnacion subsequently testified that she agreed to surrender the child to the defendant's mother in the Dominican Republic because of Encarnacion's then drug problems and unstable

Toward the end of Encarnacion's direct examination, the prosecutor questioned her about statements she made to police soon after returning to Lawrence. Encarnacion testified that she had lied at that time, in particular regarding her knowledge of the gun and its disposal, and her trip to the airport in New York with the defendant in August, 2004. She testified that she had been afraid, that she believed she could go to jail because she knew something about a murder, and that she had been depressed, but that she had since been seeing a therapist and taking medication. Encarnacion said that she was in court because she wanted to be honest and tell the truth and she no longer wanted to put herself in the "middle of anything."

On cross-examination, defense counsel elicited testimony that Encarnacion had sworn to tell the truth when she appeared before the grand jury, but that she had lied in testifying that, when the defendant came back to their apartment with blood on his clothes, he was crying and saying things such as, "I can't believe Gringo made me do this." Encarnacion insisted that although she had lied out of fear for her life, she was being honest in her trial testimony. "At that point, I was trying to

living circumstances. Sometime roughly in December, 2006, after Encarnacion had begun speaking to police and the defendant had been charged in this case, the defendant's mother and brother told Encarnacion that her daughter had died. Encarnacion neither sought nor received confirmation of her daughter's death.

defend him, but now I'm not defending nobody. . . . I have three kids. I have two living with me. One, his mother took away, which I'm going to fight back. And I am not here to put him down. Because if I really wanted to put him down, I would have just came to the police and made up another story saying maybe he shot the guy; don't you think?"

At that point, defense counsel asked, "You just told the jury that [the defendant's] mom -- who's out in the hall, right? -- has your daughter, [a]nd you're now going to fight to get your daughter." Encarnacion responded:

> "Because she told me my daughter was dead for three years. She adopted my daughter, and made me believe my daughter was dead for three years. And she brings her today, to this court, to make me look nervous and make me look stupid and maybe put myself in the middle for this: okay. I'm very nervous right now. My daughter is alive. She made me believe for three single years. I ended up in a psychology center, cutting myself, going crazy, thinking my daughter is dead. And all of a sudden, she's here today? That's not fair. That's not fair."

See note 8, supra. Defense counsel also asked whether Encarnacion had attempted suicide because the defendant's mother had custody of her daughter, to which Encarnacion replied, "No. Because she made me believe my daughter was dead."

After a brief recess, defense counsel questioned Encarnacion regarding her perceptions of the child in the hallway whom she believed to be her daughter. He elicited testimony that Encarnacion's daughter would have been a little over three years

old, and then sought to present the child, whom defense counsel described as fifteen months old, to the jury, in order to show that the child could not rationally have been mistaken for a three year old. The judge denied as collateral and unduly prejudicial the request to present the child for Encarnacion to identify and for the jury to see. He noted that the information could be introduced through other means, such as testimony by other witnesses.[9]

The defendant contends that the judge impeded his ability to cross-examine Encarnacion by denying his request to present the child in court and by allowing the Commonwealth to rehabilitate Encarnacion on redirect examination with details regarding the circumstances in which she saw the child. The Massachusetts and Federal Constitutions guarantee a defendant's right to cross-examine prosecution witnesses. See Commonwealth v. Meas, 467 Mass. 434, 449 (2014), quoting Commonwealth v. Allison, 434 Mass. 670, 681 (2001); Commonwealth v. Mercado, 456 Mass. 198, 202 & n.9 (2010). "Nevertheless, a judge may limit the scope of cross-examination as long as he or she does not completely bar inquiry

---

[9] At side bar, counsel described Encarnacion as having gone off "on this tirade that I think is irrational, and shows she's psychotic." The judge inquired of both attorneys if they thought the witness was "too distraught to testify" further that day, and the prosecutor agreed that she was. Encarnacion's testimony resumed the following day.

into a relevant subject." Commonwealth v. Williams, 456 Mass. 857, 873 (2010). A judge has broad discretion in circumscribing the proper scope of cross-examination, Commonwealth v. Mercado, supra at 203; Commonwealth v. Vardinski, 438 Mass. 444, 451 (2003), and may impose such limits "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant." Commonwealth v. Johnson, 431 Mass. 535, 540 (2000), quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). See Commonwealth v. Avalos, 454 Mass. 1, 7 (2009), and cases cited. To determine whether a judge acted beyond this discretion, "we weigh the materiality of the witness's direct testimony and the degree of the restriction on cross-examination." Commonwealth v. Mercado, supra, quoting Commonwealth v. Vardinski, supra. The defendant bears the burden of proving that the judge acted improperly. See Commonwealth v. Avalos, supra, quoting Commonwealth v. Weichel, 403 Mass. 103, 105 (1988).

We conclude that the judge did not abuse his discretion in prohibiting the defendant from presenting the child for Encarnacion to identify and for the jury to see. Notwithstanding the materiality of Encarnacion's testimony in corroborating the defendant's participation in the killing, the judge did not "bar

all inquiry into the subject" of her mental state. See

Commonwealth v. Avalos, supra at 7, quoting Commonwealth v.

Allison, supra at 681. Defense counsel elicited testimony that

Encarnacion had struggled in the past with mental health issues,

that no one had told her that the child she saw was her daughter,

that her only reason for believing the child to be her daughter

was that she saw from afar the defendant's mother holding the

child, and that she made no attempt to verify the child's

identity at that time. Furthermore, although he would not allow

the child to be brought into the court room, "[t]he trial judge

provided counsel an opportunity" to present other evidence of the

child's age and physical appearance, which counsel ultimately

decided not to do. See Commonwealth v. Williams, 456 Mass. at

873. The judge had discretion to limit the manner in which

counsel could offer evidence of the child's apparent age. Cf.

Commonwealth v. Mercado, supra at 203-204 (judge could limit

defense counsel's use of "inflammatory" photographs on cross-

examination where counsel thoroughly cross-examined witness

regarding point in question). In particular, the judge noted his

concern that presenting the child in the court room would cause

Encarnacion unnecessary distress. Cf. Commonwealth v. Johnson,

431 Mass. at 540, quoting Alford v. United States, 282 U.S. 687,

694 (1931) (judge should "protect [a witness] from questions

which go beyond the bounds of proper cross-examination merely to harass, annoy or humiliate").

The defendant contends also that Encarnacion's testimony on redirect examination was overly broad and unduly prejudicial because it suggested that the defendant and his mother had acted intentionally to provoke Encarnacion's response to the child. "The purpose of redirect examination is to explain or rebut adverse testimony or inferences developed during cross-examination." Commonwealth v. Borgos, 464 Mass. 23, 35 (2012), quoting Commonwealth v. Hoffer, 375 Mass. 369, 375 (1978). As with cross-examination, a trial judge has considerable discretion over the scope of redirect examination. See Commonwealth v. Rosario, 460 Mass. 181, 193 (2011); Commonwealth v. Ostrander, 441 Mass. 344, 356, cert. denied, 543 U.S. 867 (2004). A defendant who asserts an abuse of this discretion on appeal "assumes a heavy burden." Commonwealth v. Arriaga, 438 Mass. 556, 577 (2003), quoting Commonwealth v. Maltais, 387 Mass. 79, 92 (1982). See Commonwealth v. Ostrander, supra at 356-357, quoting Commonwealth v. Roberts, 433 Mass. 45, 51 (2000) (judge has "nearly unreversible discretion" with respect to redirect examination).

The judge in this case carefully limited the scope of redirect examination. The defendant's challenge to Encarnacion's

credibility, based on her belief that the child she saw in the court house was her daughter, opened the door for the Commonwealth to rehabilitate Encarnacion by allowing her to explain the circumstances that led her to form this belief. See Commonwealth v. Arriaga, 438 Mass. at 577; Commonwealth v. Marrero, 427 Mass. 65, 69 (1998); Commonwealth v. Olszewski, 416 Mass. 707, 718 (1993), cert. denied, 513 U.S. 835 (1994). In particular, the judge permitted Encarnacion to testify that the defendant's mother had informed her of her daughter's death in the course of berating and threatening her for cooperating with police; that she never received confirmation of her daughter's death, such as a death certificate or photographs from the funeral; that she saw the defendant's mother holding a baby girl in the court house hallway; and that the child resembled her daughter. "Having opened the door to this information, . . . the defendant's claim of prejudice is highly suspect." Commonwealth v. Marrero, supra, quoting Commonwealth v. Otsuki, 411 Mass. 218, 236 (1991).

At the same time, the judge minimized the prejudicial impact of the testimony by preventing the prosecutor from suggesting that the defendant or his mother intentionally arranged Encarnacion's encounters with the child in order to provoke her

reaction.[10] He sua sponte cut-off Encarnacion's testimony when it appeared that she would begin testifying about the motive of the defendant's mother. Likewise, when Encarnacion testified that she thought the defendant's mother was attempting to "intimidate" her, the judge asked defense counsel if he would like to have that comment stricken. Defense counsel declined, apparently based on his strategic assessment that Encarnacion's testimony sounded irrational and only harmed her credibility; at sidebar, defense counsel suggested that the longer Encarnacion testified about the child, the more irrational she appeared. Finally, the judge repeatedly offered to issue a limiting instruction, which defense counsel declined, that Encarnacion's testimony on redirect examination was to be used only to evaluate her credibility. See Commonwealth v. Stone, 70 Mass. App. Ct. 800, 807 (2007) ("The trial judge's offer to give a jury instruction to emphasize the limited relevance of [the witness's] testimony shows the extent to which he analyzed the prejudicial effect versus the probative value before deciding in favor of admissibility").

---

[10] The judge expressed concern that the defendant might be unduly prejudiced if the jury were to conclude that the defendant or his family had devised the plan to bring the child into the court house and display her to Encarnacion in order to unhinge her, and, on that basis, further conclude that the defendant had done so because he was guilty of the charged offenses and needed to impeach the person to whom he had confessed.

The defendant argues that presenting alternative evidence of the child's appearance or requesting a limiting instruction would have exacerbated the prejudice to him by drawing greater attention to his possible role in a scheme to manipulate Encarnacion.  Defense counsel was free to make such a tactical assessment, but we presume that the jury would have heeded any limiting instruction.  See Commonwealth v. Roberts, 433 Mass. 45, 52-53 (2000).  There was no abuse of discretion in the manner in which the judge limited the scope of Encarnacion's cross-examination and her redirect examination.

3.  Failure to instruct on second-degree felony-murder based on uncharged offense.  The defendant argues that it was error to decline to give an instruction on felony-murder in the second degree based on the uncharged offense of distribution of cocaine. Whereas felony-murder in the first degree is predicated on a felony that is punishable by a sentence of life in prison, felony-murder in the second degree is predicated on a felony with a maximum sentence of less than life in prison.  See Commonwealth v. Burton, 450 Mass. 55, 57 (2007).  To support a conviction of felony-murder in the second degree, there must be a homicide that occurs during the commission or attempted commission of a felony; the homicide must be a "natural and probable consequence" of the predicate felony, see Commonwealth v. Stokes, 460 Mass. 311, 315

(2011); and the felony must be either "inherently dangerous" or "committed so that the circumstances demonstrate 'the defendant's conscious disregard of the risk to human life.'" Commonwealth v. Burton, supra, quoting Commonwealth v. Matchett, 386 Mass. 492, 508 (1982). A defendant is entitled to an instruction on felony-murder in the second degree only if there is a rational basis in the evidence to support such a conviction. See Commonwealth v. Bell, 460 Mass. 294, 306-307 (2011). "[T]he felony on which a charge of felony-murder is premised may be uncharged, so long as the evidence supports it." Commonwealth v. Stokes, supra.

The defendant requested an instruction on felony-murder in the second degree predicated on the uncharged offense of "drug distribution." The judge denied the request on the ground that the evidence did not provide a rational basis for conviction of that offense. The predicate felony of "drug distribution," whether understood as distribution of a controlled substance or as possession with intent to distribute a controlled substance, requires proof of possession. See G. L. c. 94C, §§ 32A, 32B, 32C, 32D, 32E. The only evidence supporting the defendant's theory of "drug distribution" was that the defendant, the joint venturers, and the victims all were drug dealers, and the defendant's statement that he went to the apartment to collect "like a debt" from Castro in the form of drugs that he believed Castro had "brought . . . from Texas." There was no evidence

that controlled substances were present in the apartment, or that any of the intruders came into possession of the drugs the defendant alleges they were there to collect. In the absence of evidence supporting possession or constructive possession of a controlled substance, the jury could not permissibly have found that the defendant committed the felony of distribution of a controlled substance or possession with intent to distribute a controlled substance. Therefore, there was no error in the denial of the defendant's request for an instruction on murder in the second degree predicated on such offenses.[11]

4. <u>Instruction on intervening cause</u>. The defendant maintains also that the judge erred in declining to give a requested instruction on intervening cause, arguing that the evidence warranted a finding that Castro's death was caused by Cedeno's intentional delay in contacting emergency personnel.[12]

---

[11] In his reply brief, the defendant suggests that the evidence sufficed to show attempted distribution of a controlled substance. We need not address the merits of this argument because the defendant was not charged with this offense and did not request an instruction on the basis of this offense. See <u>Commonwealth</u> v. <u>Stokes</u>, 460 Mass. 311, 315 (2011). Moreover, even had there been error, there would have been no prejudice to the defendant in declining to give such an instruction where, as here, the defendant "was also convicted under the alternate theor[y] of . . . extreme atrocity or cruelty." See <u>Commonwealth</u> v. <u>Brum</u>, 438 Mass. 103, 119 n.23 (2002).

[12] This claim hinges in part on the defendant's argument "that Cedeno had a motive to allow Castro to bleed to death by delaying the 911 call in order to advance in the drug organization." The evidence does not support such an inference.

This argument is unavailing.  If "death follows as a consequence of [an individual's] felonious and wicked act, it does not alter its nature or diminish its criminality to prove that other causes cooperated in producing the fatal result."  Commonwealth v. McLeod, 394 Mass. 727, 744-745, cert. denied sub nom. Aiello v. Massachusetts, 474 U.S. 919 (1985), quoting Commonwealth v. Hackett, 2 Allen 136, 142 (1861).  See Commonwealth v. Davis, 403 Mass. 575, 582 (1988).  "The general rule is that the intervening conduct of a third party will relieve a defendant of culpability only if such an intervening response was not reasonably foreseeable."  Commonwealth v. Rosado, 434 Mass. 197, 203, cert. denied, 534 U.S. 963 (2001), quoting Commonwealth v. Niemic, 427 Mass. 718, 727 (1998).  Although "the judge was required to instruct the jury on any issues which could be inferred from the evidence," Commonwealth v. McLeod, supra at 745, he was not required to give a requested instruction unless competent evidence proffered by the defendant, viewed in a light favorable to him, reasonably supported such an inference.

The defendant points to evidence that, viewed favorably to him, he contends would support a reasonable inference that Cedeno delayed at least several minutes before calling 911 and requesting emergency medical assistance:  she first made telephone calls attempting to reach her mother and her former boy

friend who lived in the same apartment building as Castro.[13]  It was reasonably foreseeable, however, that there would be a delay before emergency medical assistance would reach Castro.  At most, the effect of Cedeno's delay "was merely to prevent any recovery that might otherwise have taken place."  Commonwealth v. Costley, 118 Mass. 1, 27 (1875).  It was not an intervening cause that then became the proximate cause of Castro's death.  Because the evidence does not support the defendant's theory of an intervening cause, the judge did not err in refusing to grant the requested instruction.  See Commonwealth v. McLeod, 394 Mass. at 744-745.

5.  Instruction that there was no evidence of accident.  The defendant contends that the judge provided an erroneous instruction in connection with the charge of murder in the first degree based on the theory of extreme atrocity or cruelty, and that his counsel was ineffective for failing to object to the instruction.  Because the defendant did not object, we review to determine whether any error created a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Jewett, 442 Mass. 356, 370 (2004).  Likewise, when "the defendant has been

---

[13] Viewing the evidence favorably to the defendant, Castro was still alive when the men left the apartment.  In his statement to police, the defendant described Castro's condition as "kind of alive," and said, "Calvo was still sort of alive" when they left.

convicted of murder in the first degree, 'we consider his claim of ineffectiveness of counsel to determine whether there exists a substantial likelihood of a miscarriage of justice . . . which is more favorable to a defendant than the constitutional standard for determining ineffectiveness of counsel.'" Commonwealth v. Franklin, 465 Mass. 895, 909 (2013), quoting Commonwealth v. Walker, 460 Mass. 590, 598 (2011). We conclude that there was no error.

As to the first element of murder in the first degree on a theory of extreme atrocity or cruelty, the judge instructed:

> "[T]he Commonwealth must prove to you beyond a reasonable doubt . . . that the defendant committed an unlawful killing. For a killing to be murder, it must be unlawful. An unlawful killing is a killing done without excuse. Not all killings are unlawful. A killing may be excused, for example, in cases of self-defense, defense of another, or in some cases, accident. The evidence in this case does not raise the issue of whether the killing was excused as a result of self-defense, defense of another, or accident."

The defendant argues that the last sentence of this instruction prevented the jury from considering accident to mitigate malice. However, a "judge's comment to the jury regarding the absence of accident [is] not an invasion of their fact-finding function" unless the issue of accident is "fairly raised" by the evidence. See Commonwealth v. Podkowka, 445 Mass. 692, 698-699 (2006).

In support of his argument that the killing occurred accidentally, the defendant focuses exclusively on evidence related to the shooting itself. As the judge instructed,

however, "As to the charge of murder, the Commonwealth does not allege that the shooting of Raphael Castro, in and of itself, was the act that constitutes the killing.  Rather, the Commonwealth alleges that the shooting, along with the acts allegedly taken thereafter, caused Mr. Castro's death."  We presume that the jury followed this instruction, see, e.g., Commonwealth v. Morales, 461 Mass. 765, 784 (2012), and therefore that they relied on the evidence introduced regarding the intruders' conduct after the shooting.  This evidence included that the intruders bound Castro with duct tape, repeatedly struck him, and left him in a locked room without a telephone, while he bled profusely.  Evidence of such conduct suffices to prove malice, even if the defendant did not intend Castro's death, see Commonwealth v. Plunkett, 422 Mass. 634, 637 (1996), and there is no suggestion that any of this conduct was accidental.  Hence, because the jury were not called upon to decide whether the shooting itself was accidental, the issue of accident was not fairly raised and the judge's instructions were not erroneous.

6.  Relief pursuant to G. L. c. 278, § 33E.  Having carefully reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E, we discern no reason to reduce the verdict of murder in the first degree or to order a new trial.

Judgments affirmed.