NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12023

COMMONWEALTH  vs.  ELIAS SAMIA.

Worcester.     February 10, 2023. - June 1, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Wendlandt, & Georges, JJ.

Homicide.  Felony-Murder Rule.  Kidnapping.  Joint Enterprise.
    Evidence, Joint venturer, Hearsay, Prior misconduct,
    Relevancy and materiality, State of mind, Redirect
    examination, Inflammatory evidence.  Error, Harmless.
    Practice, Criminal, Capital case, Argument by prosecutor,
    Assistance of counsel.

Indictment found and returned in the Superior Court
Department on February 15, 2012.

The case was tried before Daniel M. Wrenn, J.; a motion for
a new trial, filed on March 18, 2020, was heard by him; and a
motion for reconsideration was considered by him.

Richard J. Shea for the defendant.
Ellyn H. Lazar, Assistant District Attorney, for the
Commonwealth.

LOWY, J.  After a jury trial in the Superior Court, the

defendant, Elias Samia, was convicted of murder in the first

degree on theories of deliberate premeditation and felony-

murder, with aggravated kidnapping as the predicate felony, in connection with the disappearance of the victim, Kevin Harkins, in February of 1994. The defendant appealed and, after his appeal was entered in this court, he filed a motion for a new trial. The motion was denied, after which the defendant filed a motion to reconsider, which was also denied. The defendant then filed another notice of appeal.

The defendant's consolidated appeal is now before the court. He contends, and the Commonwealth concedes, that, because at the time of the offense the felony of aggravated kidnapping did not exist, he could not have been convicted on the theory of felony-murder in the first degree. He also raises issues relating to the propriety of evidence introduced at trial, purportedly improper argument by the prosecutor, and ineffective assistance of counsel, ultimately contending that these issues entitle him to a new trial.

Having carefully examined the record, we affirm the conviction of murder in the first degree on the theory of deliberate premeditation and decline to exercise our authority under G. L. c. 278, § 33E, to reduce the verdict or to order a new trial.

Background. "We recite the facts the jury could have found, viewing them in the light most favorable to the

Commonwealth and reserving certain details for later discussion." Commonwealth v. Trotto, 487 Mass. 708, 711 (2021).

On February 15, 1994, the victim walked out of Suney's Pub (Suney's) in Worcester. He left behind a Boston Celtics jacket, house keys, a pack of cigarettes, and an unfinished beer. The victim was never seen again, and his disappearance remained unsolved for eighteen years. In 2012, the defendant was indicted for the murder along with Matteo Trotto and John Fredette.

1. Illegal drug business and the victim's disappearance. The trio charged with the victim's murder were as close as brothers, referred to each other as such, and were involved in a long-standing illegal drug operation together. Trotto was the leader of the operation, and Fredette and the defendant worked under him. Customers who purchased cocaine from the trio's operation included Donald St. Pierre, Robert Beahn, and the victim. Typically, customers would call pager numbers, and then the customer would receive a telephone call back to coordinate the purchase.

In late 1993, a few months before the victim's disappearance, Fredette was arrested for trafficking in cocaine based on information provided to the police by St. Pierre. Beahn was also arrested and charged with possession of cocaine

with intent to distribute and possession of marijuana.  Fredette and Beahn saw one another at the police station.

Fredette believed that either Beahn or the victim had informed on him to the police, resulting in his arrest. Fredette suspected Beahn because Beahn was charged with less serious offenses, and he suspected the victim because the victim was friends with the police officer who had arrested him. Unaware that the actual informant was St. Pierre, Fredette told St. Pierre to stay away from both Beahn and the victim because they could be working for the police.  Fredette also told St. Pierre that he was going to kill the informant.

After being released on bail, Beahn went to Suney's with the string from his sweatpants hanging loosely around his neck. While there, Trotto grabbed the string around Beahn's neck and told Beahn that if he had anything to do with Trotto's "brother" being arrested, Trotto would kill him.  After Fredette's arrest, Trotto provided the victim with cocaine in exchange for false testimony in Fredette's pending criminal trial.  Fredette told St. Pierre that, if the victim did not show up to testify, Fredette would kill the victim.

On February 14, 1994, the victim did not appear at Fredette's trial.  Fredette then pleaded guilty to a reduced offense and was sentenced to State prison, but the execution of his sentence was stayed.  After he was sentenced, Fredette said

to the defendant and Beahn, "if I ever catch the motherfucker that did this, the things I'm going to fucking do," while the defendant stood next to him and put his hand on Fredette's shoulder. The next evening, the victim was inside Suney's when Trotto appeared and motioned for the victim to come outside. The victim walked out of the bar, leaving behind his cigarettes, money, keys, Celtics coat, and half a glass of beer. The victim did not return to Suney's that night and was never seen again.

In the early hours of the morning on February 16, 1994, only hours after Trotto had motioned the victim out of Suney's, the defendant was driving in his 1985 Chevrolet Impala with Fredette as a passenger. The Impala was originally painted blue but had been repainted black. Millbury police Officer Mark Moore observed the Impala speeding and, after calling in the Impala's license plate, learned that a blue Impala was registered to the defendant. Moore stopped the car, and when he asked the defendant for his license and registration, the defendant produced his license but not his registration. The defendant explained that the Impala had recently been painted black and that he had given the registration to his insurance company. When Moore asked why he would do that, the defendant "was unable to provide an answer." When Moore asked where the defendant was coming from, he said they were coming from a local bar, but the answer was inconsistent with where Moore had first

seen the Impala.  The defendant also claimed during his conversation with Moore that he going to drop Fredette off. After the stop was completed, Moore followed the Impala west on Route 20.  He eventually stopped following the Impala and drove to the defendant's address.  Moore stayed there for about an hour, but the defendant did not return during that time.

James Whalen, an employee of Ace Auto Sales (Ace Auto), was called into work at 5:30 A.M. on February 16, 1994, to assist in dismantling a car.  When Whalen arrived at Ace Auto, he recognized the defendant's Impala;[1] Trotto arrived soon thereafter.  Trotto told Whalen to get rid of the Impala and keep his mouth shut or he and his family would never be safe. Whalen and other Ace Auto employees, including Alan Dudley, dismantled the Impala.  Dismantling the Impala stood out in Dudley's memory because the owner of Ace Auto told him that someone had been shot in the Impala.  Parts from the dismantled Impala were disposed of in numerous places; some were thrown into the pond behind Rusmart Auto Trim (Rusmart), another business operated by Ace Auto's owner.

---

[1] Whalen had rebuilt the carburetor in the defendant's car. At that time, he put a sticker on the carburetor, which he saw while dismantling the Impala.  Additionally, Whalen was aware that the defendant had originally bought a blue Impala but that it had been painted black.  The Impala's paint was also distinctive to Whalen because while the car was black, the doorjambs remained blue.

2. <u>Subsequent investigations</u>. In March 1994, about three weeks after the victim disappeared, the defendant was arrested as part of the Worcester police department's ongoing investigation into the trio's drug enterprise. When he was arrested, the defendant had a licensed gun in his waistband and a business card in his wallet. The business card had what appeared to be a vehicle identification number (VIN) written on the back. When police looked up the VIN, it corresponded to the Impala. Thereafter, the police learned about Officer Moore's stop of the Impala on February 16, 1994, and contacted him. The police also learned that the defendant had turned in the license plate from the Impala to the registry of motor vehicles (registry) on February 16, 1994.

Years later, in 2005, authorities conducted a dive of the pond behind Rusmart. The diving team was looking for "car parts from a chopped car" "within throwing distance of the shoreline." Although the pond was difficult to navigate, a number of car parts were retrieved, including a car door and a rear quarter panel. An expert, having examined the parts, testified at trial that the door and panel recovered from the pond were consistent with a 1985 Impala. Both blue and black paint were visible on the recovered parts.[2]

---

[2] In addition to the expert testimony regarding the parts, both the door and rear quarter panel were admitted in evidence.

In 2008, the victim's disappearance came up during a conversation between Fredette, the defendant, and Fredette's son, Richard Denaris. Despite Fredette's warnings to "shut up" about the "guy in the papers," the defendant said he did what he had to do for family. The defendant explained that Trotto was driving while Fredette and the defendant were beating up the victim, but that "it got out of control, and [the defendant] had to take a gun and shoot [the victim]." The defendant also mentioned being stopped by Officer Moore after shooting the victim and said that "the cop was lucky he stopped searching when he did." The defendant also said in front of Denaris that the victim's body was "buried in a shallow grave using lime" so pigs "would get whatever the lime did not dissolve." In 2013, Denaris was in custody on unrelated charges when he informed the police of what the defendant had told him about the victim's disappearance.

3. Defendant's indictment, trial, and posttrial motions. In 2012, the trio was indicted for the victim's murder and tried separately. Fredette and Trotto were convicted by the jury in their respective trials.[3] See Trotto, 487 Mass. at 710;

---

[3] Both Trotto and Fredette were convicted of murder in the first degree on a theory of felony-murder, with aggravated kidnapping as the predicate felony. See Trotto, 487 Mass. at 710; Commonwealth v. Fredette, 480 Mass. 75, 75-76 (2018). Because at the time of the offense the predicate felony of aggravated kidnapping did not exist, the convictions of murder

Commonwealth v. Fredette, 480 Mass. 75, 75-76 (2018).  The defendant was tried before a jury in 2014.  At the conclusion of the trial, the jury found the defendant guilty of murder in the first degree on theories of deliberate premeditation and felony-murder, with aggravated kidnapping as the underlying felony.  Thereafter, he timely appealed.  In March 2020, he filed a motion for a new trial, contending that trial counsel was ineffective by not introducing historical weather data which would have impeached testimony about parts of the Impala being thrown in the lake behind Rusmart.  The motion was denied after a nonevidentiary hearing.  Thereafter, he filed a motion for reconsideration, which was also denied.

Discussion.  1.  Felony-murder.  The defendant contends, and the Commonwealth concedes, that his conviction of murder in the first degree on a theory of felony-murder was improper because the predicate felony of aggravated kidnapping did not exist at the time of the killing.  See Trotto, 487 Mass. at 715-716; Fredette, 480 Mass. at 86-88.  We agree and therefore vacate the felony-murder conviction.  However, the defendant's

---

in the first degree were vacated.  See Trotto, supra at 710-711; Fredette, supra at 76-77.  In Trotto, we remanded the matter to the Superior Court for entry of a verdict of guilty of murder in the second degree and for resentencing.  See Trotto, supra.  In Fredette, we remanded the case for the trial judge to determine whether a conviction of murder in the second degree should enter or whether the defendant was entitled to a new trial.  See Fredette, supra at 77.

argument that this error requires either a new trial or reducing the verdict to murder in the second degree fails.

Unlike Trotto and Fredette, who were granted the relief the defendant now requests, the defendant was also convicted of murder in the first degree on a theory of deliberate premeditation in addition to a theory of felony-murder. The conviction on the theory of deliberate premeditation was supported by the evidence at trial, and as none of the other issues the defendant raises are sufficient to warrant relief, the conviction of premeditated murder in the first degree must stand. See Commonwealth v. Wadlington, 467 Mass. 192, 208 (2014).

2. Joint venture evidence. The defendant next takes issue with the admission of certain statements by Trotto and Fredette that were admitted under the joint venture exemption to the rule against hearsay. See Mass. G. Evid. § 801(d)(2)(E). These arguments hinge on the contention that, to the extent there was a joint venture, it was limited to the time immediately preceding and subsequent to the kidnapping of the victim. The defendant argues that, because the statements at issue fall outside that time frame, the judge erred in admitting such statements under the joint venture exemption to the rule against hearsay. Because the defendant objected at trial, we review the judge's admission of this evidence for prejudicial error,

Commonwealth v. Chalue, 486 Mass. 847, 873 (2021), and conclude that there was no error.

a. The challenged testimony. As relevant to these issues of joint venture, there was evidence before the jury that collectively the trio was involved in a drug dealing operation led by Trotto with Fredette and the defendant working under him. St. Pierre testified to buying cocaine from Trotto, and that at one point in August 1993, he owed money for cocaine. St. Pierre testified that he arranged to satisfy that debt by doing brick work at a tavern owned by Trotto. St. Pierre told the jury that after he had completed brick work on the tavern, Fredette and the defendant came outside, and the defendant gave Fredette his gun. At that point, Fredette threatened St. Pierre with the gun and told him to leave and that he was not going to be paid for the brick work. St. Pierre also testified that after Fredette had been arrested, Fredette told St. Pierre not to deal with Beahn or the victim because either one could be the informant and he was going to kill the informant. Fredette also told St. Pierre that the victim was going to give false testimony in the drug case and if the victim did not do so, Fredette would kill the victim. Additionally, during cross-examination, St. Pierre testified that, after Fredette's arrest, all three members of the trio threatened the victim. Over the defendant's objection, the judge admitted this testimony as statements of a joint

venturer and instructed the jury on the requirements of statements by joint venturers including what the Commonwealth was required to prove in order for the statements to be attributed to the defendant.

Michael Davidson testified, over objection, that after Fredette and Beahn had been arrested, Trotto choked Beahn with a sweatpants string that was around his neck and stated that "if [Beahn] had anything to do with [Trotto's] brother being arrested the night before, [Trotto would] kill him." Davidson also testified about an incident where Trotto pointed the defendant's gun at him, St. Pierre, and the victim, and stated that he was going "rabbit hunting," presumably in reference to Beahn, whose nickname was "Rabbit." Before these statements by Trotto were elicited from Davidson, the judge again reminded the jury of his prior detailed instruction on what was required for Trotto's statements to be attributed to the defendant as the statement of a joint venturer.

Beahn testified that, after he had been released on bail following his arrest, Trotto threatened him. Fredette told Beahn that he believed the victim was the police informant because of his friendship with a police officer who worked as a bouncer at Suney's. Beahn testified further that Fredette asked him whether he was the informant and stated that, if he was, "we can get this taken care of today." Beahn's testimony regarding

these statements by Trotto and Fredette, respectively, were accompanied by the judge reminding the jury that his full instruction on statements by a joint venturer were applicable to the statements.

b. _Joint venture exemption to the hearsay rule_. "We recognize an [exemption from] the hearsay rule whereby 'statements by joint venturers are admissible against each other if the statements are made both during the pendency of the cooperative effort and in furtherance of its goal.'" Commonwealth v. Steadman, 489 Mass. 372, 379 (2022), quoting Commonwealth v. Bright, 463 Mass. 421, 426 (2012). In order to be admissible, the Commonwealth must prove the existence of the joint venture by a preponderance of the evidence, separate from the statements of the joint venturers. Steadman, supra. See Mass. G. Evid. § 801(d)(2)(E). This exemption to the hearsay rule "derives from an analogy between a criminal venture and a lawful partnership," Bright, supra, such that "the statement of each joint venturer is equivalent to a statement by the defendant," Commonwealth v. Stewart, 454 Mass. 527, 535 (2009). To introduce such a statement, "the Commonwealth must show, by a preponderance of the evidence, that a joint venture existed between the declarant and the defendant, and that the statement

was made [during and] in furtherance of the joint venture,[4] while the joint venture was ongoing."[5]  Commonwealth v. Wardsworth, 482 Mass. 454, 460 (2019).  "If the judge is satisfied that the Commonwealth has met this burden, the

---

[4] Our case law has suggested that in certain narrow circumstances, statements of joint venturers may be admissible even if the statements preceded the joint venture.  That murky case law is of no moment here because we conclude infra that it was permissible for the Commonwealth to rely on the drug distribution enterprise as the underlying joint venture, and all of the statements admitted under the joint venture exemption to the rule against hearsay were made during and in furtherance of that illegal enterprise.  We recognize that Commonwealth v. Carriere, 470 Mass. 1, 10-11 (2014), and Commonwealth v. McLaughlin, 431 Mass. 241, 248 (2000), suggest that statements that preceded the joint venture may fall within the joint venture exemption to the hearsay rule, and that Commonwealth v. Rakes, 478 Mass. 22, 38-40 (2017), and Commonwealth v. Wilkerson, 486 Mass. 159, 175-176 (2020), reference this exception to the general rule.  To the extent that there is a narrow exception to the general rule that statements must be made both during and in furtherance of the joint venture in order to be admissible and attributed to the defendant, it is limited to the circumstances discussed in Rakes, supra, where statements involving preparation to enter the joint venture or where statements of intent to join a joint venture are relevant and necessary to understand the history of the joint venture.

[5] We also emphasize that "the joint venture [exemption] to the hearsay rule does not apply to statements made after the joint venture has ended."  Chalue, 486 Mass. at 875, quoting Commonwealth v. Winquist, 474 Mass. 517, 522 (2016).  "However, [s]tatements made in an effort to conceal a crime, made after the crime has been completed, may be admissible under the joint venture [exemption] because the joint venture [remains] ongoing, with a purpose to ensure that the joint venture itself remains concealed" (quotation and citation omitted).  Chalue, supra.  "In essence, the inquiry to determine whether a statement was made during the pendency of a criminal enterprise and in furtherance of it focuses not on whether the crime has been completed, but on whether a joint venture was continuing" (quotation and citation omitted).  Id.

statement[s] may be admitted, and the jury are instructed that they may consider the statements only if they find that a joint venture existed independent of the statements, and that the statements were made in furtherance of that venture" (citation omitted).[6] Commonwealth v. Winquist, 474 Mass. 517, 521 (2016). It is noteworthy that "[b]efore considering the statement [of a joint venturer] as bearing on the defendant's guilt, . . . the jury must make their own independent determination, again based on a preponderance of the evidence other than the statement itself, that a joint venture existed and that the statement was made in furtherance thereof" (quotation and citation omitted). Commonwealth v. Holley, 478 Mass. 508, 534 (2017). "We review the decision to admit such statements for abuse of discretion, and we view the evidence of the existence of the joint venture in the light most favorable to the Commonwealth, recognizing

---

[6] The defendant appears to argue that the judge erred in not instructing the jury as to the permissible scope of the joint venture, but this argument misses the mark. Once the judge is satisfied with the Commonwealth's showing, "the jury must make their own independent determination, again based on a preponderance of the evidence other than the statement itself, that a joint venture existed." Chalue, 486 Mass. at 874. Here, upon concluding that the Commonwealth had met its preliminary burden, the judge properly instructed the jury on the requirements for the statements of Trotto and Fredette to be attributed to the defendant. Implicit in the judge's ruling was that the statements fell within the period of the joint venture and that, if the jury felt otherwise, they would not have considered the statements.

that it may be proved by circumstantial evidence."  Commonwealth

v. Carter, 488 Mass. 191, 209 (2021).

c.  Analysis.  i.  Existence of a joint venture.  The

defendant contends that to the extent there was a joint venture,

evidence of it should be limited to the kidnapping and murder of

the victim.  There is no requirement, however, that the joint

venture upon which the Commonwealth relies to admit statements

against the defendant be the crime charged so long as the

Commonwealth meets the requirements for the hearsay exemption by

demonstrating, independent of the coventurer's statements, (1)

that a cooperative venture existed and (2) that the statements

being admitted were made both "during the cooperative effort and

in furtherance of its goal."  Mass. G. Evid. § 801(d)(2)(E).

See Commonwealth v. Lowery, 487 Mass. 851, 865 n.15 (2021) ("The

general rule that declarations by joint venturers are admissible

against fellow venturers applies where a conspiracy or common

enterprise is shown to exist even though it is not charged"

[citation omitted]); Commonwealth v. Colon-Cruz, 408 Mass. 533,

544 n.4 (1990) (same).  See also United States v. El-Mezain, 664

F.3d 467, 502 (5th Cir. 2011), cert. denied, 568 U.S. 977 (2012)

(under joint venture exemption to hearsay rule, "it is not

necessary that the conspiracy upon which admissibility of the

statement is predicated be" crime for which defendant is charged

[citation omitted]); United States v. Layton, 855 F.2d 1388,

1398 (9th Cir. 1988) ("the common enterprise or joint venture on which admission of a coventurer's statement is based need not be the same as the charged conspiracy, if any"), overruled on other grounds by Guam v. Ignacio, 10 F.3d 608, 612 n.2 (9th Cir. 1993); United States v. Miller, 644 F.2d 1241, 1244 n.5 (8th Cir. 1981) ("it is well established that the crime of conspiracy need not be charged in order to invoke the [joint venture exemption to the hearsay rule]").

Here, "[t]here [was] ample evidence, apart from the out-of-court statements themselves, to support an adequate probability of the existence of a common [drug distribution] venture, between and among [Trotto, Fredette,] and the defendant" (quotation and citation omitted). Bright, 463 Mass. at 435. The evidence showed that the trio was involved in an illegal drug distribution operation led by Trotto and supported by Fredette and the defendant. Drug customers looking for product would call pager numbers when looking for drugs and then would receive a call back to arrange the purchase. Evidence of the trio working together included testimony from customers who in some instances would call Trotto's pager number and then receive a call from Fredette. After Fredette's arrest, the defendant and his coventurers concocted a scheme to have the victim offer perjured testimony in Fredette's drug tracking case. But the victim never appeared at Fredette's trial, thereby resulting in

Fredette accepting a plea.  Thus, the evidence showed that that the trio's involvement in this drug business eventually evolved into murder after the group concluded that an informant had provided information that led to Fredette's arrest, creating a threat to their business.  See, e.g., Colon-Cruz, 408 Mass. at 544 ("[I]t was not essential that murder be part of the original plan, if it was one of the probable consequences of the robbery which was intended to be effected by the use of a deadly weapon" [citation omitted]).  Therefore, the judge did not err in determining that Trotto, Fredette, and the defendant were joint venturers in an illegal drug distribution enterprise which led to the victim's murder.  Cf. Commonwealth v. Mitchell, 468 Mass 417, 427 (2014) ("the evidence . . . was sufficient for the judge to conclude that Team Supreme was an organized drug distribution group and, in light of the group's collective involvement in the killing and its cover-up, that the murder was committed in furtherance of the group's business interests").  As such, it was permissible for the Commonwealth to introduce statements by Trotto and Fredette provided that there was sufficient evidence to warrant a determination that their statements were made both during the pendency of and in furtherance of the drug business, and that the existence of the drug business was proved by a preponderance of the evidence

separate from the statements of the joint venturers.  See Mass. G. Evid. § 801(d)(2)(E).

ii.  Specific statements.  The first statement at issue is St. Pierre's testimony about Fredette threatening him with the defendant's gun.  In determining the admissibility of this statement, the context of St. Pierre's relationship with the trio is key.  St. Pierre, who unbeknownst to the trio ultimately became the informant, explained that at the time Fredette threatened him, he had been working off a drug debt.  We have previously stated that "an illegal drug distribution business may see the perception of weakness as potentially fatal to an enterprise that wishes to protect its turf against competitors." Mitchell, 468 Mass. at 427.  A similar inference can be drawn from the situation described by St. Pierre, given that he owed money to the trio's drug enterprise and was working off that debt at the time that Fredette threatened him with a gun and told him that he would not be paid for his work.  "In the perverse world of a street drug organization, violence in response to perceived threats [to the organization's business interests] is often viewed as necessary to maintain its customer base."  Id.  "Violence in drug dealing can be viewed as an extension of behaviors that are associated with efficiency and success in legitimate business" (citation omitted).  Id. Therefore, the judge did not abuse his discretion in concluding

Fredette's threat was in furtherance of the ongoing drug distribution operation.

As to the remaining statements that the defendant challenges, each one directly referenced punishing and killing the informant or threatening and harming the two people that the trio suspected of being the informant -- Beahn and the victim. Such statements were not only in furtherance of protecting the larger drug enterprise, but also within the more limited scope of finding and harming the informant. To the extent that it is unclear exactly whether Trotto made his statement about going "rabbit hunting" before or after Fredette was arrested, the statement was still made during and in furtherance of the trio's drug distribution enterprise.

3. Evidence of the defendant's drug arrest and the subsequent police investigation. At trial, retired Worcester police Officer Brendan Harney, who was involved in arresting Fredette in 1993 and the defendant in 1994, testified about an investigation into the trio's drug distribution enterprise spanning from late 1993 to early 1994. He described the drug operation as being managed by Trotto with Fredette and the defendant working under him. Harney explained that part of the operation involved surveillance of the tavern owned by Trotto. Harney testified that as part of the surveillance into the drug operation, he became familiar with the defendant's Impala,

including that it was originally blue but was later painted black. Harney also testified about his involvement in Fredette's 1993 drug arrest and that he arrested the defendant for drug distribution related activity approximately three weeks after the victim's disappearance.

Harney testified that when the defendant was arrested, the police seized a firearm,[7] a cell phone, two pagers, and his wallet. Inside the defendant's wallet, the police recovered a business card. Written on the back of the business card was a series of numbers and letters with the word "VIN" written underneath it. Believing the writing to be a VIN, Harney searched a registry database and discovered the VIN was attached to a 1985 Chevy Impala that was owned by the defendant. He also learned that the Impala had been stopped by the Millbury police in the early morning hours of February 16, 1994. Harney's investigation into the VIN also resulted in him learning that

---

[7] To the extent that the defendant takes issue with Harney's discussion that the defendant was licensed to carry a firearm and had it on his person when he was arrested, the argument is of no moment. There was evidence before the jury, in the form of statements attributed to the defendant, that the defendant had shot the victim, and "[e]vidence regarding a weapon that could have been used in the course of a crime is admissible, in the judge's discretion, even without direct proof that the particular weapon was in fact used in the commission of the crime" (quotation and citation omitted). Chalue, 486 Mass. at 873.

the license plate attached to the Impala had been returned to the registry on February 16, 1994.

Over the defendant's objection, the judge admitted the evidence as probative for the nonpropensity purpose of showing "the defendant's state of mind, his intention, motive, or the existence of a plan or scheme in a joint venture."  Prior to Harney's detailed testimony, the judge provided a limiting instruction.

"Although the prosecution may not introduce so-called . . . bad act evidence to illustrate a defendant's bad character, such evidence may be admissible if relevant for a nonpropensity purpose."  Chalue, 486 Mass. at 866.  "Even if the evidence is relevant for a proper purpose, it will not be admitted if the judge determines that its probative value is outweighed by risk of unfair prejudice to the defendant, taking into account the effectiveness of any limiting instruction," which we "generally presume that a jury understand and follow" (citation omitted). Id.  Specifically, as to evidence of acts subsequent to a charged offense, "[t]he Commonwealth is entitled to 'show the whole transaction of which the crime was a part,' including uncharged conduct after the crime was committed."  Commonwealth v. Cardarelli, 433 Mass. 427, 434 (2001), quoting Commonwealth v. Longo, 402 Mass. 482, 489 (1988).  "To be sufficiently probative, however, the evidence of postcrime conduct 'must be

connected with the facts of the case or not be too remote in time.'" Caradelli, supra, quoting Commonwealth v. Barrett, 418 Mass. 788, 794 (1994). Here the defendant objected to this testimony at trial, "thus we review the judge's decisions to determine whether there was an abuse of discretion and, if so, whether it amounted to prejudicial error." Chalue, supra.

The judge did not expressly weigh on the record the probative value of Harney's testimony against the risk of unfair prejudice to the defendant. See Mass. G. Evid. §§ 403, 404(b)(2). While certainly not the best practice, the judge's failure to do so is not fatal, because "[s]uch a determination is implicit in the judge's consideration of the tender of, and the objection to, the evidence and the judge's ultimate decision to admit it."[8] Commonwealth v. Mahan, 18 Mass. App. Ct. 738, 741

---

[8] We take this opportunity to emphasize the importance of specificity and precision in the context of ruling on bad act evidence. Practitioners should avoid justifying the admission of bad act evidence simply by reciting a list of permissible nonpropensity purposes that have been previously accepted by this court or discussed in Mass. G. Evid. § 404(b) & note. Proffering a laundry list of nonpropensity purposes is not helpful, nor is it proper. Indeed, it is counterproductive. Rather, counsel proffering bad act evidence should articulate the precise nonpropensity purpose for the proffered evidence, and the judge should instruct the jury that they may consider the evidence only for that narrow nonpropensity purpose.

Thereafter, it falls upon the judge to "articulate the precise manner in which the [bad act evidence] is relevant and material to the facts of the particular case." Commonwealth v. Andre, 484 Mass. 403, 415 (2020), citing Mass. G. Evid. § 401 and P.C. Gianelli, Understanding Evidence 168 (5th ed. 2018).

n.1 (1984). Within the context of this particular case, Harney's testimony about the defendant's subsequent arrest had probative value as to the continued existence of the drug distribution enterprise, which continued after the victim's death, and which the Commonwealth argued served as a motive for the killing. See Winquist, 474 Mass. at 523 ("Absent clear indication that the venture [has] ended, it is reasonable to infer that concealment of the venture [is] ongoing" [citation omitted]). Cf. Commonwealth v. Rousseau, 465 Mass. 372, 389 (2013) (bad act evidence "represented instances of conduct that were part of a larger continuum of behavior constituting a single criminal enterprise").

Moreover, Harney's testimony about the arrest was episodic and necessary to explain how the police investigation evolved and led to uncovering the Impala's VIN on the card in the

---

That the evidence "may be relevant to a specific, nonpropensity purpose does not render the evidence admissible." Andre, supra. Rather, it must be admissible for the specific nonpropensity purpose argued by the proponent of the evidence. Thereafter, the best practice is for the judge to consider and articulate on the record "'the risk that the jury will ignore the limiting instruction and make the prohibited character inference' and use the evidence for an inadmissible purpose, such as propensity." Id., quoting Giannelli, supra. "Once the judge articulates these considerations on the record, it is then within the judge's discretion to determine whether the probative value of the [bad act evidence] is outweighed by the risk of prejudicial effect on the defendant," taking into account the effectiveness of a proper limiting instruction (emphasis added). Andre, supra. See Commonwealth v. Facella, 478 Mass. 393, 408-409 (2017).

defendant's wallet, which in turn led the police to discover that the Impala was stopped by Millbury police in the early hours of the morning on February 16, 1994, and that the Impala's license plate was returned to the registry that same day.  See Commonwealth v. Marrero, 427 Mass. 65, 67 (1998) ("The prosecution [is] entitled to present as full a picture as possible of the events surrounding the incident itself" [citation omitted]).  The testimony about this chain of events was compelling evidence regarding how the police began linking the trio to the victim's disappearance.  Given how probative this evidence was to the ongoing drug distribution enterprise, which the Commonwealth contended led to the murder, and the process by which the police began connecting the trio to the victim's disappearance, we cannot say the judge abused his discretion.

To the extent that there was a risk of unfair prejudice to the defendant, the judge provided a limiting instruction on this issue both at the time the evidence was admitted and during the final charge.  See Commonwealth v. Forte, 469 Mass. 469, 480-481 (2014) (no error in admission of prior bad act evidence where, among other things, jury instructions minimized potential for prejudicial effect); Commonwealth v. Donahue, 430 Mass. 710, 718 (2000) (proper jury instructions can render potentially prejudicial evidence harmless).  We presume that the jury

followed those instructions. See Commonwealth v. Bryant, 482 Mass. 731, 737 (2019).

4. Victim's state of mind. The defendant next challenges the admission of testimony by five witnesses concerning statements made by the victim. The statements were introduced in evidence to show the victim's state of mind, namely that he feared the defendant, Trotto, and Fredette, such that the victim would not have willingly entered the Impala on the night in question. As the defendant objected to these statements, we review for prejudicial error. See, e.g., Commonwealth v. Sharpe, 454 Mass. 135, 141 (2009).

First, St. Pierre testified that the victim knew that Trotto had previously shot a man in a sandpit and that the victim believed Fredette was a killer. This testimony was both preceded and followed by a limiting instruction that the statements were to be considered only "for the limited purpose of what effect that information had on the state of [the victim's] mind when he allegedly left the Suney's Pub on the evening of February 15, 1994." Next, Michael Davidson testified about a time when the defendant put his gun on the bar, and later that day, Trotto was seen pointing a gun stating that he was going "rabbit hunting." Davidson explained that after this incident, the victim told him, "Don't screw with [Trotto] because he'll kill you. He's that type of person." The judge

again provided a limiting instruction prior to this testimony limiting the jury's consideration of the statement to the victim's "state of mind on the evening of February 15, 1994," when he left Suney's.

Later in the trial, Daniel Kachadoorian, the manager of Suney's, testified, over objection, that the victim told him that Trotto and Fredette intended to beat Beahn to find out whether Beahn or someone else was the informant that got Fredette arrested. A limiting instruction was provided prior to Kachadoorian's testimony about the victim's statement. Next, Beahn testified, over defense counsel's objection, that Beahn asked the victim whether the trio was "going to kill [Beahn] over" Fredette's arrest and that the victim responded, "Yes. They're pissed." The judge again provided a limiting instruction prior to Beahn testifying about the victim's statement. Finally, Dawn Mayotte, a friend of the victim, testified that the victim "said that if he did not testify [for Fredette at his trial], that Matteo Trotto was going to kill him." This testimony was likewise accompanied by a limiting instruction that the statement was "offered for the limited purpose of its effect on [the victim's] state of mind" when he left Suney's. Finally, during the final charge, the judge again instructed the jury that the evidence described supra was "being

admitted only for the purpose of proving, if it does, [the victim's] state of mind on the night of February 15, 1994."

"Evidence of a victim's state of mind is admissible where that state of mind is relevant to an essential element of the crime charged."  Trotto, 487 Mass. at 727.  "We also have emphasized that a judge must exercise discretion and balance the probative value of such evidence against the prejudicial impact it may have on the defendant's case" (quotation and citation omitted).  Id.  "If admitted, the evidence may only be used to prove [the victim's] state of mind, and not to prove the truth of what was stated or that a defendant harbored certain thoughts or acted in a certain way" (quotation and citation omitted).  Id.  "Here, the Commonwealth had the burden of proving that the defendant had confined the victim 'against his will,' G. L. c. 265, § 26, in order to establish kidnapping as the predicate offense for felony-murder.  All the challenged statements by the victim were directly or indirectly relevant to the voluntariness of his entry into the Impala . . . , and thus relevant to an essential element of the crime of kidnapping."  Id. at 727-728.[9]

---

[9] While the defendant characterizes portions of the testimony outlined supra as inadmissible bad act evidence, such testimony was admissible to provide context for the victim's statements.  See, e.g., Commonwealth v. Barbosa, 477 Mass. 658, 671-672 (2017) (no error or abuse of discretion in admitting statements describing concern for victim; "witnesses' statements were admissible 'to put in context' the victim's statement of intent to go inside the bar and have a drink").

"It is incumbent on judges to weigh the probative value of the evidence and the risk of unfair prejudice, and [to] determine whether the balance favors admission" (quotation and citation omitted). Id. at 728. Here, the judge consistently provided limiting instructions at the time each witness testified and provided another instruction during the final charge. And "we ordinarily presume that such instructions are understood by the jury and render[] any potentially prejudicial evidence harmless" (quotation and citation omitted). Id. "Given what the Commonwealth was required to prove to establish the [predicate] crime of kidnapping,[10] we cannot say that the judge's decision to allow the introduction of the testimony, mitigated by limiting instructions, was an abuse of discretion." Id.

5. Dudley's redirect examination. At trial, Alan Dudley was one of the witnesses who testified about the dismantling of the Impala. On cross-examination, the defendant's trial counsel asked Dudley numerous questions that called his memory and recollection into question. Defense counsel's questions suggested that Dudley's memory was unreliable and that there was

_____

[10] We note that while the crime of aggravated kidnapping did not exist at the time of the murder, the crime of kidnapping did and also required the same showing by the Commonwealth that the defendant confined the victim "against his will." See Trotto, 487 Mass. at 715-716, 726-728.

no reason why the dismantling of the Impala would stand out in his memory.  Specific questions posed by defense counsel elicited that Dudley could not remember exactly when he worked at Ace Auto, did not recall the month, day, or date that the car at issue was dismantled, and could not accurately recall what car parts he removed during the dismantling process.  Defense counsel also sought to impeach Dudley with inconsistencies between his trial testimony in 2014 and his testimony before the grand jury in 2012.

Over objection, on redirect examination, the prosecutor asked Dudley whether "it [was] fair to say that taking apart this car was memorable because [his boss] told [him] that someone had been shot in [the] car?"  To which Dudley responded, "Yes."  Prior to the prosecutor's question, the judge provided a limiting instruction that had been crafted with defense counsel's input.  On appeal, the defendant concedes that this single statement by Dudley "was relevant" but contends it was so unduly prejudicial that it should not have been admitted.

"The purpose of redirect examination is to explain or rebut adverse testimony or inferences developed during cross-examination" (citation omitted).  Commonwealth v. Garcia, 470 Mass. 24, 36 (2014).  Here, by suggesting the Dudley's memory regarding the Impala was unclear and inconsistent, "the defendant essentially invited the Commonwealth to address the

issue on redirect examination." Marrero, 427 Mass. at 69. In other words, "[t]he Commonwealth was entitled to rehabilitate its witness." Id. The statement at issue here was not offered for its truth; rather, it was clearly offered for its effect on Dudley to rebut defense counsel's inferences that he was an unreliable witness with an imprecise memory. That it rebutted defense counsel's inference so powerfully simply reflects its considerable probative value.

"As with cross-examination, a trial judge has considerable discretion over the scope of redirect examination." Garcia, 470 Mass. at 36. "A defendant who asserts an abuse of this discretion on appeal assumes a heavy burden" (quotation and citation omitted). Id. On this record, we discern no abuse of discretion in the judge's implicit determination that that statement's probative value was not substantially outweighed by its prejudicial effect. See Garcia, supra at 38, quoting Commonwealth v. Stone, 70 Mass. App. Ct. 800, 807 (2007) ("The trial judge's offer to give a jury instruction to emphasize the limited relevance of [the witness's] testimony shows the extent to which he analyzed the prejudicial effect versus the probative value before deciding in favor of admissibility"). Moreover, the danger of unfair prejudice from the testimony was minimized by the judge's pointed limiting instruction, which was given

before the testimony at issue was elicited and which we presume the jury followed.  Cf. Garcia, supra.

6.  Officer Moore's testimony.  At trial, among other testimony, Officer Moore testified that when he stopped the Impala early in the morning on February 16, 1994, he repeatedly asked for the defendant's consent to search the car, and the defendant refused.  The defendant contends that this testimony violated his constitutional rights under the Fourth and Fifth Amendments to the United States Constitution and arts. 12 and 14 of the Massachusetts Declaration of Rights.  The Commonwealth concedes that this testimony was admitted in error.  Where the parties differ is whether the erroneous testimony was harmless beyond a reasonable doubt.

"[T]estimonial evidence of a defendant's refusal to comply with a police request may not be admitted against him." Commonwealth v. O'Laughlin, 446 Mass. 188, 205 (2006).  Because the defendant objected to this testimony at trial, we "examine the case to determine whether the erroneous admission was harmless beyond a reasonable doubt."  Commonwealth v. Dagraca, 447 Mass. 546, 552 (2006).  "Whether an error is harmless depends on many factors, including whether the erroneously admitted evidence was merely cumulative of evidence properly before the jury.  The essential question is whether the error had, or might have had, an effect on the jury and whether the

error contributed to or might have contributed to the verdicts."
(Quotation and citation omitted.)  Commonwealth v. Perrot, 407
Mass. 539, 549 (1990).

Within the context of the entire case, this erroneous
testimony was harmless beyond a reasonable doubt.  These
erroneous statements by Moore occupied five lines within the
approximately thirty-four pages of this witness's testimony.
The erroneous statement was not echoed in other questions by the
prosecutor, nor was it discussed in the prosecutor's opening
statement and closing argument.[11]  Other admissible aspects of
Moore's testimony touched on the defendant's other suspicious
behavior during the stop, such as the direction that the
defendant was driving being inconsistent with coming from the

---

[11] The defendant's argument that the prosecutor alluded to
the refusal in closing is not persuasive.  In closing, the
prosecutor stated:  "[The defendant] know[s] what's inside the
car.  They know what can be found in the car.  They're the one[]
who know[s] what's important in the car.  They know why they
need to get rid of the car."

Read in context, this statement is not alluding to the
defendant's refusal to let Moore search the car but rather is a
reference to the plethora of evidence regarding the disassembly
and disposal of the Impala.  See, e.g., Commonwealth v. Mack,
482 Mass. 311, 322 (2019) ("during closing argument, a
prosecutor may not misstate the evidence or refer to facts not
in evidence . . .  A prosecutor is, however, entitled to marshal
the evidence and suggest inferences that the jury may draw from
it. . . .  Statements made during closing argument are to be
reviewed in the context of the entire closing, the jury
instructions, and the evidence introduced at trial" [quotations
and citations omitted]).

bar where the defendant claimed he had been.  Moreover, there was compelling evidence of the defendant's guilt that did not involve the stop, such as his own statements about shooting "the guy in the papers" and the significant consciousness of guilt evidence regarding the dismantling of his Impala.  See Commonwealth v. Basch, 386 Mass. 620, 625 (1982) ("Evidence of consciousness of guilt together with other evidence may support a determination of guilt").  As such, on this record we conclude that while the testimony was inadmissible, it was harmless beyond a reasonable doubt.  Compare Commonwealth v. Vermette, 43 Mass. App. Ct. 789, 797-799 (1997) (where defendant acknowledged presence at crime scene, and evidence of refusal to let police search vehicle was not referenced in closing argument or instructions, error in admitting refusal evidence was harmless beyond reasonable doubt), with Dagraca, 447 Mass. at 554 (error not harmless beyond a reasonable doubt, as "[b]y introducing the defendant's improperly procured admissions twice during trial and then highlighting them in closing argument, the prosecutor unmistakably relied on them in a significant way").

7.  Pamela DiCicco's testimony.  Pamela DiCicco, the defendant's former girlfriend, testified at trial.  She was asked by the prosecutor where she first met the defendant, and she answered that she had met him at a pub in Worcester.  She was next asked how she first met the defendant, and she

responded, "[b]uying drugs." The defendant objected. At the side bar discussion, the prosecutor explained that the relationship between the defendant and DiCicco evolved over time and that while the relationship began because DiCicco bought drugs from him, the defendant had "an interest in her and she starts dating him, then he requires that she stop[] taking drugs." The judge determined that the evidence was being offered and was admissible "for a non-bad act purpose to give relevance to her testimony." He discussed a proper limiting instruction with counsel and ultimately provided the following instruction:

> "[Y]ou hard testimony just now that [the defendant] was involved in drug activity. That is in no way relevant in any way to the indictments in this case. The indictment is for murder. [The defendant] is not charged with any other crime. The testimony is simply offered to you to give context to this witness's testimony, for no other purpose, and you're not to infer anything else from it other than the context that it provides to this testimony."

On appeal, the defendant contends that this testimony was inadmissible prior bad act evidence. Because the defendant objected, we review for prejudicial error.[12] "Determinations of

---

[12] The Commonwealth argues that this issue was not preserved. While it would have been better practice for trial counsel to specify that she was moving to strike the witness's answer, it is clear when reading the transcript that trial counsel's immediate objection to the witness's testimony reflected that trial counsel sought to have the answer struck. See Commonwealth v. Grady, 474 Mass. 715, 721 (2016), quoting M.S. Brodin & M. Avery, Massachusetts Evidence § 1.3.1, at 6

the relevance, probative value, and prejudice of [bad act] evidence are left to the sound discretion of the judge, whose decision to admit such evidence will be upheld absent clear error." Commonwealth v. Robidoux, 450 Mass. 144, 158 (2007). Here, the judge was likely correct that the evidence of the defendant selling drugs to DiCicco had a nonpropensity purpose of showing the nature of the relationship between the pair. Cf. Commonwealth v. Robinson, 482 Mass. 741, 752 (2019) ("In sum, the drug transactions provided additional context to the relationship between the defendant and the victim"); Commonwealth v. Oberle, 476 Mass. 539, 550 (2017) ("a defendant's prior acts of domestic violence may be admitted for the purpose of showing . . . the existence of a hostile relationship between the defendant and the victim" [quotation and citation omitted]). However, the fact that their relationship prior to dating began with drugs was of minimal probative value to the issues at trial. Admittedly, drug distribution was central to the Commonwealth's theory of joint venture. However, unlike the other evidence of drug dealing, DiCicco's testimony about drugs had no clear connection to the trio's drug business or the victim's disappearance. Considering the focus of DiCicco's testimony, that the brief references to

---

(8th ed. 2007) ("A motion to strike is the proper means of eliminating an answer that is objectionable").

the defendant's drug dealing had no clear or explicit connection to the trio's drug enterprise and was not the proffered reason for admitting the evidence or the reason the judge provided in his limiting instruction, the probative value of the evidence was outweighed by the danger of unfair prejudice. However, given the brief nature of the testimony, the judge's limiting instruction that the evidence was not admitted for propensity purposes, which we presume the jury followed, and the strength of the evidence against the defendant, we discern no prejudice from its admission.

8. Prosecutor's closing argument. The defendant challenges a portion of the prosecutor's closing argument that dealt with the testimony of Denaris. "We examine [all] the challenged statements 'in the context of the entire closing, the jury instructions, and the evidence introduced at trial.'" Commonwealth v. Kapaia, 490 Mass. 787, 801 (2022), quoting Commonwealth v. Cheng Sun, 490 Mass. 196, 217 (2022). Because "there was no objection to the prosecutor's closing argument, we review the challenged statements for error and, if they constitute error, for a substantial likelihood of a miscarriage of justice." Kapaia, supra.

"Although 'counsel may argue the evidence and the fair inferences which can be drawn from the evidence,' 'a prosecutor should not . . . misstate the evidence or refer to facts not in

evidence'" (citations omitted).  Cheng Sun, 490 Mass. at 221.
"A 'prosecutor may marshal the evidence . . . to "urge the jury
to believe the government witnesses."'"  Commonwealth v. Rakes,
478 Mass. 22, 45 (2017), quoting Commonwealth v. Polk, 462 Mass.
23, 39 (2012).  "This is especially so when defense counsel has
attacked the credibility of a Commonwealth witness."  Rakes,
supra.  In order to do so, a prosecutor may discuss "the
evidence presented and the reasonable inferences that can be
drawn from that evidence."  Id.  "The inferences for which
counsel argues need not be necessary, or inescapable; they only
need be reasonable and possible."  Id.

Here, the defendant takes issue with portions of the
prosecutor's closing argument relating to Denaris's testimony.
The defendant contends that, when discussing Denaris's
testimony, the prosecutor's argument mischaracterized events and
testimony from other witnesses, and "[t]he language used . . .
risked being misunderstood as Denaris testifying to some
knowledge of the events recounted by" other witnesses.  In
essence, the defendant takes issue with the prosecutor's
inferences that Denaris should be believed because his
statements were consistent with or similar to other evidence.

Contrary to the defendant's contentions, when the entire
passage is read in context, the prosecutor did not impermissibly
bolster Denaris's credibility and falsely state that his

testimony was corroborated by other witnesses. Rather, he was marshalling the evidence and presenting an inference that could be drawn from it. When the challenged statements are evaluated in their proper context, the prosecutor was urging the jury to make reasonable inferences from the evidence to "provide[] the jury with reasons to credit the account of a key witness." Rakes, 478 Mass. at 45. Such a tactic constitutes permissible argument. The prosecutor did not introduce or allude to evidence that was not before the jury. He never implied that Denaris had independent knowledge of information not presented to the jury. Rather, because defense counsel attacked Denaris's credibility in her closing, the prosecutor was "respond[ing] to an argument made by the defense at closing." Commonwealth v. Mason, 485 Mass. 520, 539 (2020). By comparing Denaris's testimony to other evidence and pointing out consistencies between them, the prosecutor was drawing a reasonable inference that Denaris's testimony about what the defendant and Fredette told him was similar or consistent with other pieces of evidence and therefore Denaris "should logically be believed." Commonwealth v. Wilkerson, 486 Mass. 159, 181 (2020), quoting Commonwealth v. Rolon, 438 Mass. 808, 816 (2003). On this record, we cannot say the prosecutor erred by "point[ing] to the logical reasons [Denaris]'s testimony should [have been]

believed" after his credibility had been called into question. Commonwealth v. Koumaris, 440 Mass. 405, 414 (2003).

9. Ineffective assistance of counsel. The defendant's claim of ineffective assistance of counsel centers on the testimony of Whalen, who testified that after dismantling the defendant's Impala on February 16, 1994, parts of the Impala were thrown into the pond located behind Rusmart. This testimony was somewhat contradicted by Dudley, who testified that, after it was dismantled, parts from the Impala were left next to the dumpster at Rusmart. But Whalen's testimony was corroborated by the admission of car parts consistent with the Impala that were fished out of the Rusmart pond and expert testimony relating to those parts.

The defendant alleged in his motion for a new trial that trial counsel was ineffective for failing to introduce a weather report which, the defendant contends, would have shown that the pond was frozen on the day that the Impala parts were purportedly thrown into it. The motion was supported by an affidavit from trial counsel, who averred that she did not call an expert to testify about the weather conditions and did not recall investigating the weather conditions for February 16, 1994. The motion judge, who was also the trial judge, denied the defendant's motion and subsequently denied his motion for reconsideration, to which the defendant had attached an article

about ice growth that the defendant purports supported his claim that ice on the pond behind Rusmart "had to have been very thick, as much as five feet."

"In this consolidated appeal, the defendant raises the same ineffective assistance of counsel arguments asserted in his motion[] for a new trial." Commonwealth v. Norris, 483 Mass. 681, 686 (2019). "Because the statutory standard of [G. L. c. 278, § 33E,] is more favorable to a defendant than is the constitutional standard for determining the ineffectiveness of counsel, we analyze this claim under the rubric of § 33E to determine whether there exists a substantial likelihood of a miscarriage of justice" (quotations and citations omitted). Commonwealth v. Gibson, 489 Mass. 37, 52 (2022). "Under this review, we first ask whether defense counsel committed an error in the course of the trial. If there was an error, we ask whether it was likely to have influenced the jury's conclusion" (quotations and citations omitted). Commonwealth v. Denson, 489 Mass. 138, 151 (2022).

At its core, the defendant's claim here is that trial counsel should have impeached a particular witness whose testimony was already in conflict with other testimony. "We apply 'a stringent standard of review to claims of ineffective assistance because of failure to impeach a witness.'" Commonwealth v. Watkins, 473 Mass. 222, 239 (2015), quoting

Commonwealth v. Jenkins, 458 Mass. 791, 805 (2011). "This is true even when reviewing the claim under G. L. c. 278, § 33E." Commonwealth v. Moore, 489 Mass. 735, 746 (2022). "In general, failure to impeach a witness does not prejudice the defendant or constitute ineffective assistance." Commonwealth v. Bart B., 424 Mass. 911, 916 (1997). See Jenkins, supra ("Failure to impeach a witness does not, standing alone, amount to ineffective assistance"). "Even on the more favorable standard of review under § 33E, a claim of ineffective assistance based on failure to use particular impeachment methods is difficult to establish." Commonwealth v. Fisher, 433 Mass. 340, 357 (2001). "Impeachment of a witness is, by its very nature, fraught with a host of strategic considerations, to which we will, even on § 33E review, still show deference." Id. "[A]bsent counsel's failure to pursue some obviously powerful form of impeachment available at trial, it is speculative to conclude that a different approach to impeachment would likely have affected the jury's conclusion." Moore, supra, quoting Commonwealth v. Garvin, 456 Mass. 778, 792 (2010).

Here, the defendant failed to provide any support for his claim apart from the weather report. Rather, he contends that the weather report for the general area is conclusive evidence that the pond would have been frozen and that, as a result, it would have been impossible to throw car parts into the water.

Absent expert testimony to this effect or an affidavit in support of it, this contention is nothing more than mere conjecture, which cannot be sufficient to support a claim of ineffective assistance of counsel.  See Commonwealth v. Alicea, 464 Mass 837, 850-851 (2013) ("A claim of ineffective assistance of counsel for failure to call an expert witness is generally doomed where [t]he defendant's claim is not supported by any affidavits to disclose the content of the omitted expert testimony" [quotation and citation omitted]); Commonwealth v. Gonzalez, 443 Mass. 799, 811 (2005) ("Claims of ineffective assistance must be shown by specific instances of attorney incompetence, not by mere speculation" [quotation and citation omitted]); Commonwealth v. Bolduc, 375 Mass. 530, 540 (1978) (speculation that facts existed, which if uncovered by further investigation might improve defendant's case, was not enough to support ineffective assistance of counsel claim).

To the extent that such evidence could have been admitted solely for impeachment purposes, on this record, impeachment of Whalen based on the purported weather conditions was unlikely to have influenced the jury.  This is particularly true given that Dudley's testimony was already inconsistent with Whalen's, and as a whole, the totality of the evidence connecting the defendant and his Impala to the victim's death was overwhelming irrespective of the parts found in the pond.  As such, we

conclude that the failure to introduce evidence about the weather on February 16, 1994, did not amount to ineffective assistance of counsel.

10.  Review under G. L. c. 278, § 33E.  We have carefully reviewed the entire record, pursuant to our duty under G. L. c. 278, § 33E, and we discern no reason to set aside or reduce the verdict or to order a new trial.

Conclusion.  We affirm the defendant's conviction and the orders denying his motions for a new trial and for reconsideration.

So ordered.